*In re* MANUEL PIZARRO COLÓN, querellado.

*Números:* CP-99-196 *Resuelto:* 25 de mayo de 2000
CP-97-8

*María de Lourdes Rodríguez* y *José A. Crescioni Benítez,* oficiales investigadores de la *Comisión de Ética del Colegio de Abogados de Puerto Rico; Pedro Malavet Vega,* abogado del querellado; *Flavio E. Cumpiano Villamor,* Comisionado Especial.

PER CURIAM: Para fines decisorios, hemos consolidado estas dos (2) querellas, aunque en su estructura interna, las exponemos separadamente, siguiendo el orden de presentación.

I

El 16 de julio de 1996, el Colegio de Abogados de Puerto Rico (Colegio) presentó una querella contra el Lcdo. Manuel Pizarro Colón —admitido al ejercicio de la abogacía y notaría el 28 de junio y 16 de julio, respectivamente—([1]) imputándole violación a los Cánones 2, 8 y 19 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. Con previa resolución nuestra de 18 de octubre de 1996, el 13 de agosto de 1997 el Colegio presentó una segunda querella CP-97-8, imputándole infracciones a los Cánones 12, 21, 35 y 37 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. En ambas querellas, designamos Comisionado Especial al Hon. Flavio E. Cumpiano Villamor, ex Juez Superior, para que en presencia de las partes, oyera y recibiera la prueba.

Luego de varios incidentes interlocutorios y trámites —incluso una querella enmendada— el 7 de julio de 1998 se celebró la vista evidenciaria([2]) y el 9 de julio de 1999 el Comisionado rindió su informe en torno a la querella CP-96-9. El 31 de agosto, hizo lo propio respecto a la querella CP-97-8. En ambos, consignó los hechos que sirven de trasfondo a nuestra decisión. Expongámoslos.

II

*Querella CP-1996-9*

En 1979, la Sra. Mariana Caraballo Pérez adquirió un inmueble, sito en la Urb. Santa María, Calle B-115, Ponce.

---

([1]) Subsiguientemente, el 9 de enero de 1997, por sentencia, lo suspendimos *temporeramente* de ambas funciones por deficiencia en su obra notarial e incumplimiento a nuestras órdenes.

Conforme la norma pautada en *In re Vergne Torres y Álvarez Meléndez*, 137 D.P.R. 777 (1995), en vista de las etapas adelantadas de ambas quejas, continuamos el trámite disciplinario de las querellas.

([2]) A pedido del Colegio de Abogados de Puerto Rico, el 26 de septiembre de 1997, suspendimos los procedimientos por seis (6) meses, debido a una oferta de transacción, reservándonos la decisión final sobre los efectos de cualquier transacción en los trámites disciplinarios. El 12 de mayo de 1998, por recomendación del Comisionado Especial, extendimos la paralización seis (6) meses más.

Asumió una hipoteca de treinta y cinco mil dólares ($35,000), reducida a treinta y dos mil seiscientos sesenta dólares con cuarenta y cinco centavos ($32,660.45) y constituyó una segunda hipoteca en garantía de un pagaré al portador por diecinueve mil trescientos cuarenta dólares ($19,340) que entregó a los vendedores en pago y garantía del precio aplazado de compraventa. Años después, el 26 de febrero de 1986, el Tribunal Superior, Sala de Ponce, dictó sentencia en cobro del principal de diecinueve mil trescientos cuarenta dólares ($19,340) garantizado por la *segunda hipoteca*, más intereses, costas, gastos y honorarios de abogados. *Dicha sentencia se anotó en el Registro de Sentencias del Registro de la Propiedad de Ponce I, el 30 de septiembre de 1987.*

El 13 de marzo, la Federal Home Loan Mortgage Corp. demandó ante el Tribunal Federal para el Distrito de Puerto Rico, en ejecución de la *primera hipoteca*, ante el incumplimiento de los pagos mensuales. El 26, solicitó al Registrador de la Propiedad de Ponce, que anotara la demanda. *Dicha anotación se insertó en la nota marginal a la inscripción del inmueble cuyo titular era la señora Caraballo Pérez.*[3]

El 21 de mayo, presentada en el tribunal (y presentada ante el Registro) la demanda de ejecución de la primera hipoteca, y emplazada su dueña, la señora Caraballo Pérez, ésta concedió autorización exclusiva a Housing Real Estate[4] para la venta de la propiedad. Dicho acuerdo lo

[3] El Registrador no firmó la nota. Tuvo que ser firmada después por otro el 19 de agosto de 1988.

[4] Firma de corretaje de bienes raíces, de la cual el licenciado Pizarro Colón —quien posee además licencia de corredor de bienes raíces— era socio por igual, junto a su sobrino, el Sr. José Hiram Santiago Ortiz. Compartían oficina en la calle Torres en Ponce, desde donde también operaba Housing Real Estate. En septiembre de 1986, inscrita en el Departamento de Estado el 27 de octubre, incorporaron a "Housing de Ponce y Caguas, Inc.", que operaba coetánea y separadamente con "Housing Real Estate". Entre sus objetivos y propósitos, según el certificado de incorporación, "Housing de Ponce y Caguas, Inc.", no se dedica al corretaje de bienes raíces, específicamente, al negocio de comprar y vender bienes raíces.

suscribió el Sr. José Hiram Santiago Ortiz —sobrino y socio del licenciado Pizarro Colón en el negocio de bienes raíces— a nombre, y como agente autorizado, de Housing Real Estate. Se anejó el documento que consignaba lo siguiente: "2da Hipoteca [$]19,000-, la primera Hipoteca está atrasada y la segunda 2da también [-] de la venta se pagará todo". Autorización de Venta, anejo. Acordaron además, que Housing Real Estate cobraría un cinco por ciento (5%) de comisión del precio de venta —sesenta y cinco mil dólares ($65,000)—. Aunque no consta que el licenciado Pizarro Colón participara o interviniera directamente en el acuerdo, sí fue enterado de éste. (Carta de 20 de abril de 1990, dirigida por él, al Colegio de Abogados.)

Así las cosas, la Sra. Gloria Álvarez Sanabria acudió a Housing Real Estate interesada en comprar el bien. La atendió el señor Santiago Ortiz, con quien negoció y visitó el inmueble. Las veces que visitó la oficina de *Housing Real Estate*, vio al licenciado Pizarro Colón ser consultado por el señor Santiago Ortiz y otras personas de la empresa.

El 2 de julio, la señora Álvarez Sanabria, como compradora, otorgó contrato de compraventa con la señora Caraballo Pérez, dueña y vendedora, representada en el acto de otorgamiento por el señor Santiago Ortiz. Se fijó en sesenta y cinco mil dólares ($65,000) el precio de venta, veintiséis mil dólares ($26,000) las deudas del inmueble *(sin hacer referencia a la deuda de diecinueve mil trescientos cuarenta dólares ($19,340) garantizada por la segunda hipoteca y sobre la que recayó sentencia)* y treinta y nueve mil dólares ($39,000) la cantidad que habría de pagarse en efectivo. La señora Álvarez Sanabria entregó diez mil dólares ($10,000) y pagaría los otros veintinueve mil dólares ($29,000) en treinta (30) días.[5]

El 12 de septiembre de 1987, la señora Álvarez Sa-

---

[5] Se hizo constar que la vendedora, señora Caraballo Pérez, pagaría cuatro mil trescientos un dólares con veintitrés centavos ($4,301.23), cantidad adeudada en contribuciones sobre la propiedad. Acordaron que otorgaría pagaré por la cantidad adeudada, garantizado con propiedad que habría de adquirir.

nabria y el señor Santiago Ortiz, en representación de Housing Real Estate, *otorgaron documento suplementario*, en el que acusaron recibo de un cheque de ella por veinte mil dólares ($20,000) como adelanto de los veintinueve mil dólares ($29,000) que le restaba pagar, haciendo constar que el dinero saldaría una de las deudas hipotecarias que gravaban el inmueble. *No se mencionó la sentencia de eje- cución sobre la segunda hipoteca.* Además, Housing Real Estate se comprometió a pagar las mensualidades adeuda- das —hasta el momento de firmarse la escritura por la señora Caraballo Pérez— al *Home Federal Savings* —en- tonces *Caguas Federal Savings Bank*— de los diez mil dó- lares ($10,000) adelantados por la señora Álvarez Sanabria. No fue hasta el 16 de noviembre de 1987 —dos (2) meses después de la *enmienda supletoria* y luego de otorgada la escritura de compraventa en que se asumió la segunda hipoteca— que el señor Santiago Ortiz entregó cheque certificado a favor de Carmen Ramos y Héctor Cu- pril por siete mil cien dólares ($7,100) para satisfacer la sentencia en ejecución de la segunda hipoteca.

El 5 de noviembre de 1987, las señoras Caraballo Pérez y Álvarez Sanabria suscribieron la Escritura Núm. 86 so- bre compraventa y subrogación, *preparada y autorizada por el licenciado Pizarro Colón*. Se hizo constar la existen- cia de la primera hipoteca "reducida a $26,000.00" y de la segunda por diecinueve mil trescientos cuarenta dólares ($19,340), e indicó que la señora Álvarez Sanabria retenía su monto para el pago de ambas. Se afirmó que la señora Álvarez Sanabria ya había pagado treinta y nueve mil dó- lares ($39,000). *El licenciado Pizarro Colón no realizó un estudio registral del inmueble antes de otorgar la escritura, por lo que desconocía su estado en el Registro. Por ende, no informó a la compradora señora Álvarez Sanabria que el 30 de septiembre de 1987 —posterior a que ella entregara a Housing Real Estate veinte mil dólares ($20,000) para sal- dar la segunda hipoteca— se había anotado sentencia para*

*ejecutar la hipoteca. Tampoco informó la anotación preventiva de demanda en ejecución de la primera hipoteca que se asumiría en la escritura de compraventa.* Para esta fecha, ya el Tribunal Federal para el Distrito de Puerto Rico, había dictado sentencia el 21 de octubre de 1987.

El 12 de noviembre, días después de otorgada la escritura, la señora Álvarez Sanabria entregó un cheque por ochocientos noventa y seis dólares con treinta y cuatro centavos ($896.34) a favor de Housing Real Estate para el pago de las mensualidades de la primera hipoteca por los meses de octubre y noviembre de 1987. Housing lo cambió. El 26 de febrero de 1988, entregó otro cheque por ochocientos noventa y seis dólares con treinta y cuatro centavos ($896.34), esta vez a favor del licenciado Pizarro Colón, para pagar las mensualidades de la primera hipoteca correspondientes a los meses de diciembre de 1987, y enero y febrero de 1988. El licenciado Pizarro Colón lo endosó en blanco y luego lo endosó el señor Santiago Ortiz, quien lo cobró el mismo día. *Ni "Housing Real Estate" ni el señor Santiago Ortiz ni el licenciado Pizarro Colón pagaron las mensualidades para cuyos pagos la señora Álvarez Sanabria les entregó el dinero. Tampoco pagaron las adeudadas sobre la primera hipoteca hasta el 5 de noviembre de 1987, tal y como se obligó Housing Real Estate hacer en el anejo supletorio de 12 de septiembre de 1987. Ninguno informó a la señora Álvarez Sanabria sobre las mensualidades impagadas.* De hecho, al presentarse meses después —15 de marzo de 1988— la Escritura Núm. 86 de compraventa y subrogación de obligación al registro para su inscripción, ya se había celebrado la segunda subasta y se había adjudicado la buena pro en la ejecución del inmueble.

Posteriormente, a la señora Álvarez Sanabria, mientras trabajaba en la casa para habilitarla, fue notificada de que había sido subastada y sería desalojada. Inmediatamente, acudió al licenciado Pizarro Colón para reclamarle. Sor-

prendido, el licenciado Pizarro Colón le informó que le pagaría todos los gastos y desembolsos para que ella no perdiera su inversión. Acordó darle garantía hipotecaria. *El 19 de marzo, "Housing de Ponce y Caguas, Inc.",*(⁶) *representada por el señor Santiago Ortiz —mediante afidávit número tres mil quinientos cincuenta y ocho (3558) autorizado por el licenciado Pizarro Colón— otorgó pagaré por treinta y nueve mil dólares ($39,000) a un seis por ciento (6%) anual, vencedero a su presentación. Ese mismo día otorgó Escritura Núm. 13 de hipoteca en garantía del pagaré por treinta y nueve mil dólares ($39,000) sobre un inmueble de la Corporación Housing de Ponce y Caguas, Inc., ante el licenciado Pizarro Colón.* Es decir, el garantizador era una tercera entidad y no Housing Real Estate, el señor Santiago Ortiz, ni el licenciado Pizarro Colón. Dicha escritura que garantizaba el pagaré, no especificó el monto de la hipoteca primera y preferente que afectaba el bien dado en garantía. *Resultó que el pagaré en segundo rango no estaba garantizado, pues para su ejecución había que pagar la primera hipoteca, cosa imposible para la señora Álvarez Sanabria. Dicho pagaré hipotecario y la escritura que pretendía garantizarlo, no fueron inscritos por no existir documentos corporativos complementarios que acreditaran el negocio y las facultades del otorgante, el señor Santiago Ortiz, para efectuarlo.*

Así las cosas, el 25 de marzo de 1988, la señora Álvarez Sanabria solicitó una intervención en el caso seguido en el Tribunal Federal para que se dejase sin efecto la ejecución en pública subasta del inmueble que había comprado. La *Federal Home Loan Mortgage Corp. se opuso basado en la existencia del "lis penden" desde el 26 de marzo de 1987 en el Registro de la Propiedad,* advirtiendo el litigio de ejecución de la hipoteca. Además, señaló que no se había hecho pago alguno para satisfacer los atrasos de la hipoteca que

---

(⁶) Corporación que operaba coetánea y separadamente de la sociedad *Housing Real Estate,* que no se dedicaba al corretaje de bienes raíces.

se ejecutaba. El 5 de mayo, el foro federal rechazó la intervención. El 12 de julio, con previa orden del mencionado foro de 5 de mayo, la señora Álvarez Sanabria fue desalojada del inmueble.

El 16 de agosto, la señora Álvarez Sanabria demandó al licenciado Pizarro Colón, Santiago Ortiz h/n/c *Housing Real Estate* y otros, en el Tribunal Superior de Ponce. Reclamó devolución de las sumas entregadas y daños y perjuicios. Mediante sentencias parcial y complementarias de 23 de febrero[7] y 6 de julio de 1989, respectivamente, el tribunal condenó al licenciado Pizarro Colón y al señor Santiago Ortiz, a pagar solidariamente a la señora Álvarez Sanabria sesenta y cuatro mil ochocientos sesenta y siete dólares con diecinueve centavos ($64,867.19) en concepto de las sumas entregadas, desembolsos por reparaciones y alteraciones a la casa que perdió, y otros gastos relacionados. Además, quince mil dólares ($15,000) en daños y perjuicios, y dos mil quinientos dólares ($2,500) por honorarios de abogado.

El 20 de diciembre, a raíz de las gestiones realizadas por la señora Álvarez Sanabria para asegurar y hacer efectiva la sentencia a su favor, el licenciado Pizarro Colón informó al Tribunal Superior sobre su petición de quiebra y la orden de paralización de los procedimientos, emitida el 4 de abril de 1989.

## III

El Canon 2 del Código de Ética Profesional, *supra*, y el Canon 18 del mismo código, 4 L.P.R.A. Ap. IX,

---

[7] El 13 de abril de 1989, el licenciado Pizarro Colón y su esposa Margarita Rodríguez presentaron una Petición de Quiebra bajo el Capítulo 13, ante la Corte de Quiebra de Estados Unidos, Distrito de Puerto Rico. El 24 de agosto, se convirtió en petición bajo el Capítulo 17 del Código Federal de Quiebras.

imponen a los miembros de la profesión legal el deber de defender los intereses de sus clientes diligentemente, desplegando su máximo conocimiento en la forma generalmente aceptada por los miembros de la clase togada, como adecuada y responsable. *In re Mundo Rodríguez*, 146 D.P.R. 639 (1998); *In re Cardona Ubiñas*, 146 D.P.R. 598 (1998); *In re Osorio Díaz*, 146 D.P.R. 39 (1998); *In re Vélez Valentín*, 124 D.P.R. 403 (1989), *In re Arana Arana*, 112 D.P.R. 838 (1982). Las difíciles y complejas gestiones en su quehacer jurídico, incluso su dimensión notarial, tienen que enmarcarse dentro de los valores que se espera caractericen esta profesión. *In re Filardi Guzmán*, 144 D.P.R. 710 (1998); *In re Pereira Esteves*, 147 D.P.R. 147 (1998). Ésta requiere cuidado y que se ejerza con sumo esmero y celo profesional, cumpliendo estrictamente con la Ley Notarial de Puerto Rico y los cánones del Código de Ética Profesional. *In re Vera Vélez*, 148 D.P.R. 1 (1999); *In re Torres Olmeda*, 145 D.P.R. 384 (1998); *In re Rodríguez Mena*, 126 D.P.R. 205 (1990); *In re Vergne Torres*, 113 D.P.R. 500 (1988). Es deber del abogado, entre otros, desempeñarse con la mayor y más excelsa competencia responsabilidad e integridad; defender los intereses del cliente diligentemente, y mantener al cliente siempre informado de todo asunto importante en el caso que se le ha encomendado. *In re Arroyo Rivera*, 148 D.P.R. 354 (1999); *In re Pereira Esteves*, supra; *In re Mundo Rodríguez*, supra. La indiferencia, desidia, despreocupación, inacción y displicencia en la tramitación de un caso, viola el Canon 18 del Código de Ética Profesional, *supra —In re Arana Arana*, supra— y produce la imposición de sanciones disciplinarias. *In re Torres Olmeda*, supra; *In re Rivera Arvelo y Ortiz Velázquez*, 132 D.P.R. 840 (1993).

Intrínseco a estos deberes y la buena observancia de las responsabilidades atinentes a la profesión, el abogado —también en su función notarial— está obligado

a realizar "las averiguaciones mínimas que requieren las normas más elementales de la profesión [y las leyes aplicables] y que en aquellas ocasiones en que tenga duda sobre lo expresado por el otorgante, indague más allá de lo requerido comúnmente." *In re Vera Vélez*, supra, pág. 9. A esos efectos, "el notario que autoriza una escritura no puede ignorar el estado registral de la propiedad sobre la cual las partes otorgan la escritura a la fecha del otorgamiento". Íd. Es indeclinable su obligación de conocer el estado registral de la propiedad en su función principal de custodio de la fe pública, base esencial del sistema del notariado. Como tal, tiene el deber ineludible "de ilustrar a los otorgantes para lograr que éstos concurran al acto notarial en un estado de conciencia informada. ... Es decir, tiene que cerciorarse de hacerles a las partes todas aquellas explicaciones, aclaraciones y advertencias necesarias para lograr el consentimiento informado de los otorgantes". *In re Jiménez Brackel*, 148 D.P.R. 287, 295 (1999). Véanse: *In re Moreira Avillán*, 147 D.P.R. 78 (1998); *In re Vargas Hernández*, 135 D.P.R. 603 (1994); *In re López Maldonado*, 130 D.P.R. 863 (1992); *In re Ramos Meléndez y Cabiya Ortiz*, 120 D.P.R. 796 (1988); *In re Meléndez Pérez*, 104 D.P.R. 770 (1976); *Goenaga v. O'Neill de Milán*, 85 D.P.R. 170 (1962). Es incuestionable la importancia que reviste investigar los antecedentes, las cargas y los gravámenes, al hacerse o autorizarse una escritura, no sólo para efectos civiles o registrales, sino también para efectos notariales, " 'porque la determinación de las cargas es necesaria para la posterior concreción en la parte dispositiva de las responsabilidades que contrae cada parte contratante ...' ". *Chévere v. Cátala*, 115 D.P.R. 432, 444 (1984). Incurrir en esta falta, convierte al notario en "coautor de un consentimiento enfermo e ineficaz en derecho y habrá traicionado la fe de la que es principal guardador". *In re Meléndez Pérez*, supra, págs. 776–777.

## IV

El licenciado Pizarro Colón, preparó y autorizó una escritura de compraventa y subrogación sin realizar el debido estudio de título para conocer el estado registral del inmueble objeto de la escritura. Ello ocasionó que la señora Álvarez Sanabria adquiriera el bien desconociendo que contra ella había anotación preventiva de demanda en ejecución de la primera hipoteca, y que se había dictado y anotado sentencia para ejecutar la segunda hipoteca que gravaba el inmueble. En efecto, cuando la señora Álvarez Sanabria solicitó intervenir en el pleito seguido en el Tribunal Federal para el Distrito de Puerto Rico, buscando que se dejase sin efecto la ejecución en subasta pública del inmueble, el foro federal rechazó su intervención al acoger el planteamiento del demandante de que desde el 26 de marzo de 1987 existía en el Registro una anotación preventiva de demanda. No hay duda de que la falta de diligencia del licenciado Pizarro Colón fue el factor determinante que propició que se perjudicara la causa de acción de su cliente, ante el foro federal, y finalmente perdiera su inversión en el bien. No honró la confianza depositada por su cliente, como conocedor de los procesos legales. Manifestó claro menosprecio a la suerte que correría el derecho de su cliente e infringió los Cánones 2 y 18 del Código de Ética Profesional, *supra*.

Además, se apartó del Canon 19 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, dispositivo de que "[e]l abogado debe mantener a su cliente siempre informado de todo asunto importante que surja en el desarrollo del caso que le ha sido encomendado". El licenciado Pizarro Colón omitió informar a su cliente adecuadamente las incidencias judiciales principales que afectaban el bien inmueble, ocasionando que la señora Álvarez Sanabria consintiera el negocio jurídico sin conocimiento de causa. A la postre, su

conducta provocó que la señora Álvarez Sanabria perdiera su inversión. *In re Maduro Classen*, 142 D.P.R. 611 (1997).

## V

*Querella CP-97-8*([8])

"Housing Real Estate" también tenía oficinas en la Urb. Boneville de Caguas y eran atendidas por el Sr. Edwin Labrador. El 20 de agosto de 1986, antes de incorporarse Housing de Ponce y Caguas, Inc., *Housing Real Estate* y el señor Labrador, como agentes autorizados y en representación de la vendedora Wanda Cruz Alicea, suscribieron un contrato de compraventa mediante el cual acordaron vender al Sr. Rafael Bezares Álamo una casa sita en el P-16 de la Urbanización Reparto Valencia de Juncos. El precio convenido fue cuarenta y cinco mil setecientos dólares ($45,700) con pronto de siete mil dólares ($7,000), asumiendo primera hipoteca por treinta y ocho mil setecientos dólares ($38,700).([9])

El 21 de octubre, se firmó en Philadelphia un documento titulado "Poder Especial" en el que la Sra. Wanda Cruz Alicea instituyó a la Sra. Raquel Cruz Alicea como su apoderada, con amplias facultades, para que en su nombre

---

([8]) El 25 de agosto de 1998, el Colegio y el licenciado Pizarro Colón suscribieron la "Estipulación de Hechos", estableciendo, "[q]ue las gestiones para la venta indicada fueron realizadas por el Sr. Edwin Labrador, en el área de Caguas, quien luego fue empleado y representante de la empresa corredora Housing de Ponce & Caguas, Inc. ...". Estipulación de Hechos, pág. 1. El 2 de noviembre, luego de reexaminar y evaluar la prueba, el Colegio nos solicitó desistir de los cargos 1, 2 y 4, y se reiteró en el cargo 3.

([9]) La escritura de constitución de la Hipoteca Núm. 103 de 15 de diciembre de 1983, que gravaba la propiedad, contiene una cláusula que prohíbe enajenar, vender o gravar la propiedad sin la previa autorización escrita del Secretario de la Vivienda. Aunque, el Comisionado Especial no tuvo acceso al Registro de la Propiedad para determinar si tal restricción al derecho de propiedad se desprendía del asiento de inscripción de la hipoteca, en certificación emitida por el Registrador de la Propiedad el 4 de diciembre de 1987, se hace referencia a cargos por su procedencia, a la hipoteca constituida por la Escritura Núm. 103 de 15 de diciembre de 1983, y a los términos económicos y de vencimiento de ésta. *No obstante, la certificación registral no hace referencia alguna a la prohibición de enajenación sin la previa autorización del Secretario de la Vivienda.*

y representación vendiera el inmueble P-16 de la Urbanización Reparto Valenciano, cuya descripción registral se incluyó. Al pie de la frase "y para que así conste", y de la indicación de la ciudad y fecha, aparece en letras mayúsculas y a maquinilla el nombre de Wanda Cruz Alicea. *Sobre ello aparece a manuscrito y a manera de firma el nombre de Wanda Cruz Alicea. Debajo de la firma, y en el formato de reconocimiento de firma que se utilizaba por los notarios, se indicó lo siguiente*:

> "Sworn and suscribes (sic) before me *by héctor (sic) Alfredo Figueroa Santiago of the personal circunstance (sic)* above stated, personally Know (sic) me at 21st day of october [sic] 1986." (Énfasis suplido.) Informe del Comisionado Especial, pág. 6.

Inmediatamente debajo de ese párrafo aparece la firma de Pedro C. Rodríguez como *Notary Public*, cuya *Commission* expiró el 5 de mayo de 1989. Se acompañó la certificación de William J. Devlin, *Deputy Prothonotary* del *Court of Common Pleas of Philadelphia County*, a los efectos de que Pedro C. Rodríguez era para entonces un notario público autorizado en Pennsylvania.

El 11 de noviembre, se otorgó ante el licenciado Pizarro Colón la Escritura Núm. 39 sobre protocolización del Poder Especial antes mencionado. Compareció, como única parte, el señor Santiago Ortiz, *socio* del licenciado Pizarro Colón en Housing Real Estate, entidad que servía de corredora en la venta del inmueble para cuyo traspaso se pretendía protocolizar el "Poder Especial" que la Sra. Wanda Cruz Alicea supuestamente había conferido a la Sra. Raquel Cruz Alicea. El licenciado Pizarro Colón unió el "Poder Especial" a la escritura y, por ende, a su Protocolo de instrumentos públicos para 1986; la escritura se inscribió el 26 de noviembre.

Dos (2) semanas después, el 25 de noviembre, el licenciado Pizarro Colón autorizó la Escritura Núm. 41 sobre compraventa y subrogación de obligación, mediante la cual el señor Bezares Álamo adquirió de la Sra. Wanda Cruz

Alicea, representada por su "apoderada", la Sra. Raquel Cruz Alicea, el inmueble P-16 ubicado en el Reparto Valenciano de Juncos. Pagó siete mil dólares ($7,000) de pronto y asumió la hipoteca, reducida a treinta y ocho mil seiscientos cincuenta dólares ($38,650). El licenciado Pizarro Colón no identificó la escritura en que se protocolizó el Poder, pero sí indicó que el "apoderamiento se une junto a esta escritura ...". Escritura Núm. 41, pág. 1. Sin embargo, no lo unió.[10]

El 18 de noviembre de 1987, el señor Bezares Álamo presentó una petición de quiebra bajo el capítulo 13 de la Ley de Quiebras. En ese procedimiento no incluyó en el listado de propiedades inmuebles la propiedad adquirida en el P-16 del Reparto Valenciano ni la deuda hipotecaria asumida.

Así las cosas, y debido a que no se pagaron las mensualidades hipotecarias desde el 1ro de agosto de 1987 —ocho (8) meses después de haberse otorgado la escritura de compraventa, el 25 de noviembre de 1986— la tenedora del pagaré, Caguas Central Savings, el 30 de noviembre de 1987, un (1) año después de la compraventa, instó demanda de ejecución de hipoteca contra la titular registral del inmueble, la Sra. Wanda Cruz Alicea. El señor Bezares Álamo, aunque había presentado ya la petición de quiebra, remitió giros bancarios a la acreedora hipotecaria por el monto correspondiente a cada una de las mensualidades adeudadas, el 9, el 15 y el 17 de diciembre de 1997, dos (2) el 27 de enero, dos (2) el 4 de abril y uno (1) el 9 de mayo de 1988. La acreedora hipotecaria no hizo efectivo ni cobró esos giros porque ya se encontraba presentada la demanda de ejecución; no cubrían la totalidad del balance de la hi-

---

[10] Antes de otorgarse dicha escritura de compraventa, existían atrasos en las mensualidades de la hipoteca. En septiembre de 1986, el comprador Bezares Álamo, pagó mil ciento veintinueve dólares con treinta centavos ($1,129.30) para poner al día la cuenta. Después de adquirir la propiedad, continuó pagando los plazos mensuales hasta julio de 1987. No pudo pagar los cuatro (4) plazos de agosto a noviembre de 1987.

poteca; y porque no incluían la suma requerida —quinientos dólares ($500)— para la reinstalación del préstamo y desistimiento del caso, suma que el señor Bezares Álamo rechazó pagar. La acreedora hipotecaria continuó con los trámites del caso. El 7 de abril de 1988, el Tribunal Superior, Sala de Caguas, dictó sentencia en el caso de ejecución de hipoteca. El 4 de octubre, se subastó la propiedad y el 21, el señor Bezares Álamo —quien no era parte del caso— presentó solicitud de paralización de los procedimientos acompañando el *Stay Order* de su petición de quiebra de 18 de noviembre de 1987. Desde entonces, comenzaron las gestiones del señor Bezares Álamo para proteger la propiedad que había comprado.

Entre el 3 de agosto de 1988 y el 12 de enero de 1989, el señor Bezares Álamo presentó ante el Registro de la Propiedad, para su inscripción, la Escritura Núm. 41 de 25 de noviembre de 1986 sobre compraventa y subrogación de obligación.[11] El 12 de enero de 1989, el Registrador por primera vez exigió el documento complementario —el Poder— para inscribir a nombre del señor Bezares Álamo.

El 8 de mayo, el señor Bezares Álamo demandó en el Tribunal Superior, Sala de Caguas, a *Caguas Federal Savings*, la Sra. Wanda Cruz Alicea, *Housing Real Estate* y al señor Labrador. Solicitó la nulidad de la venta del inmueble en pública subasta y que se responsabilizara a *Housing Real Estate* y al señor Labrador por omitir suplir el documento de Poder necesario para inscribir el inmueble a su

---

[11] Un certificado de estudio de título de 3 de agosto de 1988, enuncia como titular a la Sra. Wanda Cruz Alicea, igual hipoteca y un aviso de la demanda de ejecución de la hipoteca presentada por *Caguas Central Savings*. Al dorso de una copia certificada de la Escritura Núm. 41 sobre compraventa y subrogación de obligación, ya presentada en la Sección Segunda del Registro de la Propiedad de Caguas, aparece una anotación, bajo la firma del Registrador, indicando que el 12 de enero de 1989, se había "Notificado hoy por los fundamentos incluidos en la notificación legajada [sic] bajo el número 513/221". Escritura Núm. 41, última página, dorso. Aparece también otra anotación a los efectos que la escritura había sido "Retirada para ser corregida. Caguas a 23 de enero de 1989". Íd. Otra certificación registral, de 30 de diciembre de 1997, señaló que no existía asiento alguno en el Libro Diario de Operaciones que afectase a la finca, aun inscrita a nombre de la Sra. Wanda Cruz Alicea, y gravada por la hipoteca.

nombre. Reclamó además, daños y perjuicios. No demandó al licenciado Pizarro Colón ni a Housing de Ponce y Caguas, Inc.

El licenciado Pizarro Colón asumió la representación legal de *Housing Real Estate* —de la cual era socio propietario— y del señor Labrador. En moción de 8 de diciembre, y ante la alegación del Bezares Álamo de que el "Poder Especial" era nulo e inexistente porque no daba autorización al mandatario para vender la casa, el licenciado Pizarro Colón adjuntó copia de dicho "Poder Especial" que, según él, entregó al señor Bezares Álamo.

*El 8 octubre de 1991 y ante las repetidas ausencias del licenciado Pizarro Colón a vistas señaladas*, el tribunal eliminó las alegaciones de *Housing Real Estate* y del señor Labrador. Eventualmente, el 14 de junio de 1992, dictó sentencia en la que concluyó, entre otras cosas, negligencia de parte de *Housing Real Estate* y el señor Labrador. Los condenó a pagar cuarenta y seis mil ochocientos setenta dólares ($46,870) más intereses legales presentencia y honorarios de abogado. El 18 de diciembre, el licenciado Pizarro Colón presentó una moción informativa y solicitud de paralización de procedimientos indicando *que él y su esposa, Margarita Rodríguez "d/b/a/ Housing Real Estate"* habían presentado una petición de quiebra el 3 abril de 1989, *por lo que "Housing Real Estate" estaba acogida a los procedimientos de la ley de quiebra federal.*

El 13 de mayo de 1993, el señor Bezares Álamo presentó una queja contra el licenciado Pizarro Colón ante el Colegio de Abogados. El 28 de junio, el licenciado Pizarro Colón contestó la queja y acompañó copia de las escrituras otorgadas ante él y del documento de "Poder Especial". Se señaló una vista ante la Comisión de Ética para el 9 de agosto de 1994. La notificación de vista al licenciado Pizarro Colón, certificada con acuse de recibo, fue devuelta al Colegio de Abogados el 1ro de agosto y remitida al día siguiente por correo ordinario al mismo apartado. El licen-

ciado Pizarro Colón no la recibió, por lo que no compareció a la vista señalada.

## VI

El cargo Núm. 1 imputó al licenciado Pizarro Colón no entregar al señor Bezares Álamo —comprador— la escritura de protocolización de Poder. Esto le impidió inscribir su título en el Registro, hecho que motivó que se ejecutara la hipoteca sobre el inmueble, y el señor Bezares Álamo perdiera su inversión. El Colegio expuso en su moción de desistimiento que la causa para la ejecución fue que no se pagó las mensualidades debidas, y no el hecho de que el licenciado Pizarro Colón no entregara al señor Bezares Álamo la escritura aludida.

Correcta o no la apreciación del Colegio, la prueba demostró que la Escritura de Poder Especial de su faz tenía el grave defecto de estar firmada por persona distinta a la que el *"Notary Public"* certificó firmaba ante él. Es decir, el *"Notary Public"*, Pedro C. Rodríguez, certificó que el "Poder Especial" lo juró y firmó ante él, Alfredo Figueroa Santiago cuando en realidad la firma que aparece en el documento es la de la Sra. Wanda Cruz Alicea. Aun cuando este defecto anuló la escritura y el Poder Especial que pretendió conferir, el licenciado Pizarro Colón lo protocolizó mediante Escritura Núm. 39 e inscribió el 26 de noviembre de 1986, en abierta y clara violación a la Ley Notarial de Puerto Rico y las normas éticas de la profesión. Peor aún, autorizó la Escritura Núm. 41 sobre compraventa y subrogación de obligación, en virtud del "Poder Especial" nulo, mediante la cual el señor Bezares Álamo adquirió de la Sra. Wanda Cruz Alicea, representada por la Sra. Raquel Cruz Alicea, el inmueble P-16 sito en Juncos. No identificó la Escritura de Protocolización Núm. 39 ni adjuntó, luego de indicarlo, el Poder Especial a la Escritura Núm. 41. Por sí solas, estas deficiencias anularon el negocio jurídico llevado a

cabo y, por ende, hubieran impedido la inscripción del título.

 Con su proceder transgredió la exigencia básica de que todo abogado "debe a sus clientes un trato profesional caracterizado por la mayor capacidad, la más devota lealtad y la más completa honradez". 4 L.P.R.A. Ap. IX, C. 18. Una vez más faltó a su deber de defender los intereses de su cliente diligentemente, desplegando su más profundo saber y habilidad, y actuando en aquella forma que la profesión jurídica en general estima adecuada y responsable. Íd. *In re Acosta Grubb*, 119 D.P.R. 595 (1987); *In re Vera Vélez*, supra; *In re Torres Olmeda*, supra; *In re Rodríguez Mena*, supra; *In re Vergne Torres*, supra. El licenciado Pizarro Colón actuó con evidente menosprecio de las consecuencias naturales que tenía el hecho de autorizar una escritura de compraventa a través de un "Poder Especial", cuya nulidad conocía o debió conocer.

Aceptamos el desistimiento del cargo Núm. 2 que imputó al licenciado Pizarro Colón no informar al señor Bezares Álamo —comprador— la existencia de una prohibición de enajenar el bien inmueble objeto de la compraventa, mientras estuviese vigente el subsidio del Departamento de la Vivienda bajo las disposiciones de la Ley Núm. 10 de 5 de julio de 1973 (17 L.P.R.A. sec. 651 *et seq.*). La evidencia refleja, que la certificación registral emitida el 4 de diciembre de 1987 por el Registrador, no hace referencia alguna a restricción o prohibición de enajenar, en virtud de tal programa de subsidio.

Finalmente, el cargo Núm. 3 imputó al licenciado Pizarro Colón conflicto de interés en dos (2) circunstancias distintas. *Primero*, al participar en un negocio de compraventa de bienes, lucrándose de él —como socio de la firma de bienes raíces que tramitó la venta— y también autorizar la escritura de compraventa que generó dicha gestión. *Segundo*, al aceptar una representación legal cuando su

juicio profesional estaba afectado por sus intereses personales.

Respecto a la primera situación, es evidente el conflicto de interés. En *In re Cancio Sifre*, 106 D.P.R. 386 (1977), advertimos que la ausencia en los cánones del Código de Ética Profesional de una definición específica no invalidaba la norma de que un notario no debe autorizar documento público en el que es parte una corporación controlada por él económicamente, por ser una norma inherente a la responsabilidad social y profesional de los juristas, y a la conducta moral que se espera de todo miembro de la profesión legal.

El interés tutelado es la preservación de la figura del notario "como funcionario imparcial, que recibe, expone y legitima la voluntad de los que ante él comparecen sin tomar bando, sin inclinarse a un lado u otro. Su inteligencia y su lealtad están comprometidas con una función ilustrativa que sirva y proteja a todas las partes por igual". *In re Cancio Sifre*, supra, pág. 396.

En un intento por eximirse de la responsabilidad, el licenciado Pizarro Colón estipuló con el Colegio que las gestiones para la venta las realizó el señor Labrador. La prueba refleja lo contrario. Las gestiones de la compraventa fueron realizadas por el señor Labrador, *empleado y representante de la empresa corredora Housing Real Estate*, de la cual Pizarro Colón era socio por igual, y no por Housing de Ponce y Caguas, Inc. Además, una de las partes demandadas en los casos originados por la compraventa gestada por Housing Real Estate, lo fue Housing Real Estate y no Housing de Ponce y Caguas, Inc. Se desprende también que el licenciado Pizarro Colón fue quien representó a Housing Real Estate, no a Housing de Ponce y Caguas, Inc., en los referidos casos, y fue quien informó al tribunal que Housing Real Estate estaba protegida por la

Ley de Quiebras. Informó que él hacía negocios como Housing Real Estate.([12])

En cuanto a la segunda situación, el Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, proscribe, en lo pertinente, que los abogados representen a un cliente cuando su juicio profesional puede ser afectado por intereses personales. *In re Toro Cubergé*, 140 D.P.R. 523 (1996). De este modo, se busca preservar una completa lealtad del abogado hacia su cliente, libre de ataduras personales. *In re Palou Bosch*, 149 D.P.R. 120 (1999). El licenciado Pizarro Colón, no sólo aceptó representar al señor Labrador en el pleito incoado por el señor Bezares Álamo, sino que asumió la representación de la codemandada *Housing Real Estate*, de la cual era socio. La demanda imputaba la nulidad de la compraventa, autorizada por el licenciado Pizarro Colón, por haberse utilizado un "Poder Especial" nulo, protocolizado por el licenciado Pizarro Colón. No hay duda de las ataduras que representaba tal representación, y de que su juicio profesional se vería afectado por sus propios intereses. La prohibición de que un abogado litigue un caso sobre una escritura autorizada por él como notario, busca evitar hasta la apariencia de conducta impropia de parte del notario autorizante. Por ello, ningún abogado-notario puede representar a una de las partes otorgantes en una escritura autorizada por éste en un pleito posterior para exigir las contraprestaciones a que se obligó la otra parte. C.R. Urrutia de Basora y L.M. Negrón Portillo, *Curso de Derecho Notarial Puertorriqueño*, edición privada, [s.p.], [s.e.], 1997, T. I, pág. 221. Más aún, cuando su representación implica defender la validez del documento que él autorizó, contra el interés de su cliente otorgante y a favor de una compañía o sociedad de la cual él es socio por igual.

---

([12]) No aceptamos, por tanto, la estipulación a los efectos de que quien hizo el negocio fue Housing de Ponce y Caguas, Inc., por ser patentemente incompatible con la prueba.

Concluimos, que el licenciado Pizarro Colón violó las normas éticas antes expuestas, por lo que procede su separación de la profesión legal y notarial por el término de un (1) año.

*Se dictará la correspondiente sentencia.*

El Juez Presidente Señor Andréu García no interviene. El Juez Asociado Señor Fuster Berlingeri no intervino.