**In the Matter of Thomas A. SWIHART.**

**No. 02S00–8609–DI–792.**

Supreme Court of Indiana.

Jan. 12, 1988.

Robert L. Thompson, Peebles, Thompson, Rogers & Skekloff, Fort Wayne, for respondent.

David B. Hughes, Staff Atty., Indianapolis, for Indiana Supreme Court Disciplinary Com'n.

PER CURIAM.

This proceeding was initiated by a Verified Complaint charging the Respondent in one count with various acts of misconduct under the *Code of Professional Responsibility*. The alleged misconduct stems from Respondent's representation of a young pregnant and unwed woman in an adoption matter. Respondent is charged with engaging in misconduct by continuing representation of this young woman after Respondent and his wife decided to adopt the child, by obtaining a consent form under improper circumstances, by prosecuting an adoption proceeding contrary to the wishes of his former client, by failing to seek the lawful objectives of his client and by damaging his client during the course of the professional relationship. Specifically, Respondent is charged with violating Disciplinary Rules 1–102(A)(5) and (6); 4–101(B)(1), (2) and (3); 5–101(A); 5–102(A); 5–104(A); 5–105(A); and 7–101(A)(1) and (3).

This matter is now before the court on a Conditional Agreement for Discipline tendered by the parties pursuant to Admission and Discipline Rule 23, Section 11(d). Additionally, Respondent has filed the requisite affidavit required by Section 17(a) of this rule. This Court now finds that the tendered agreement should be approved.

As agreed by the parties, we now find that in October, 1984, the Respondent was retained to represent an unwed, pregnant, eighteen year old woman in the placement of her expected child with adoptive parents. The mother informed Respondent that she would rely upon his judgment for placement, but did not want to know the identity of the adoptive parents and did not want the child placed within the local area. The child was born on December 21, 1984, and on that evening the Respondent met with the mother and biological father. Respondent left a form of "Release and Power of Attorney" which the mother signed giving Respondent temporary custody of the child. Respondent informed the mother and father that he would take custody of the child for a few days until the child was placed with the adoptive parents.

On December 23, 1984, Respondent and his wife returned to the hospital, obtained the executed "Release and Power of Attorney" and left with the child. On the next day Respondent went to the mother's residence and obtained the executed "Consent for Adoption". Between December 24, 1984, and March, 1985, Respondent and his wife decided to themselves adopt this child who remained in their home.

On or about March 4, 1985, Respondent called the mother and natural father and stated that he was coming to see them with a Notary Public to have them sign new consent forms. The Notary was Joe Williams (Williams), an attorney and personal friend of Respondent. Upon arrival, Respondent introduced Williams, gave Williams a file and then left the residence and waited outside in his automobile. On at least two occasions the parties went outside to confer with Respondent. During his discussion with the mother and father, Williams commented on how well he knew the Respondent and how nice the Respondent's family was. Williams did not directly inform the mother and father that Respondent intended to adopt the child, although he was aware of the fact. When directly confronted by the mother as to whether Respondent intended to adopt the child, Williams replied, in substance, "Yes, didn't you know?"

Williams requested the mother and father to sign the consent forms. The couple was confused and the mother believed that she could change her mind before a court hearing. The mother and father signed the consent forms prepared by Respondent which erroneously recited that the consent "was voluntarily executed without disclosure of the name(s) or other identification

of the adopting parent(s)." The forms further erroneously stated that the natural parents consented to adoption "by person(s) whose name(s) (is, are) not known to me."

After Respondent and Williams left the residence, the infant's mother and father decided that they did not want Respondent and his family to adopt the child in that they did not wish to know who the adoptive parents were or to have the child live in the local area. At no time prior to the meeting or March 4, 1985, had Respondent informed the mother and father that he intended to adopt the child or that he could no longer represent them because of his personal interest in the matter.

Shortly after the March 4, 1985 meeting, Respondent forwarded to the mother and father a proposed affidavit which recited, in part, that each "will not be appearing" for the hearing on waiver of prior written approval. Respondent also called the mother and father and inquired as to whether or not they were going to sign and return the affidavits. Consistent with their prior decision, the mother and father declined to sign the affidavits. Thereafter, another attorney was employed, written objections to the adoption were filed and the natural parents filed motions to withdraw their consents and revoked their "Release and Power of Attorney". Eventually, by court degree, the child was ordered to be returned to the mother and the consents for adoption were found to be invalid and ordered withdrawn.

By way of mitigation, the parties have advised this Court that in forming the intent to adopt the infant and in his conduct in furtherance of this intent, Respondent was responding to vigorous and powerful influence from his wife who formed an emotional attachment to the child. Respondent paid all natal expenses and all costs for the child for a period of five months, at a total cost exceeding $4,000.00, with no reimbursement.

In examining these findings, it is clear to this Court that Respondent abandoned his professional relationship for the sake of a personal interest. This type of conduct is prohibited under Disciplinary Rule 5-101(A). It is also obvious that the Respondent used personal insights gained through confidential information disclosed during the course of his professional representation of his client to form the basis of his acts. The use of this confidential information by Respondent to his personal advantage violates Disciplinary Rule 4-101(B)(3). Additionally, by abandoning the legitimate objectives of his client, Respondent damaged the interests of his client and, accordingly, violated Disciplinary Rules 7-101(A)(1) and (3). And lastly, in toto, Respondent's acts demonstrate conduct prejudicial to the administration of justice which adversely reflects on his fitness to practice law in violation of Disciplinary Rules 1-102(A)(5) and (6).

The Disciplinary Commission and the Respondent have agreed that the appropriate sanction for the misconduct noted in this case is a thirty (30) day suspension from the practice of law. Upon review of our findings and the mitigating circumstances, we are inclined to approve the agreement.

It is therefore Ordered that the Respondent be, and hereby is, suspended from the practice of law for a period of thirty (30) days beginning February 7, 1988. Upon completion of this period of suspension, the Respondent shall automatically be reinstated as a member of the Bar of this State.

Costs are assessed against Respondent.