ORDEN
Debido a la no intervención de los Jueces Asociados Se-ñores Rebollo López y Fuster Berlingeri, y a la inhibición de la Juez Asociada Señora Rodríguez Rodríguez, se cons-tituye una Sala Especial integrada por el Juez Presidente Señor Hernández Denton, el Juez Asociado Señor Rivera Pérez y la Jueza Asociada Señora Fiol Matta, para entender en el Caso Núm. CP-2003-21, In re Rivera Vicente, 2007 TSPR 189.
Lo decretó y firma.
(Fdo.) Federico Hernández Denton

Juez Presidente

CERTIFICO:
(Fdo.) Aida Ileana Oquendo Gaulau

Secretaria del Tribunal Supremo

Roberto Sánchez Ramos y Salvador J. Antonetti Stutts, pro-curadores generales, Miriam Soto Contreras, Ana Garcés Camacho y Héctor Clemente Delgado, procuradores gene-rales auxiliares, Maite D. Oronoz Rodríguez, Mariana D. Negrón Vargas Vargas y Kennette Pamias Velázquez, subprocuradores generales; Pedro Ortiz Alvarez, Marta Quiñones Zambrana, Lourdes María Torres Estevas y Mé-nica I. De Jesús Santana, abogados de la parte querellada; Enrique Rivera Santana, comisionado especial.
per curiam:
El Procurador General presentó una quere-lla contra el Ledo. Carlos Rivera Vicente (Rivera Vicente) imputándole varias infracciones al Código de Etica Profesional. En síntesis, el Procurador General sostuvo que Rivera Vicente incurrió en conducta impropia al haber mostrado interés en obtener grandes beneficios a través de la creación de una entidad corporativa para la implanta-ción de un plan creado por quien fuera su cliente, a saber, la Autoridad de Desperdicios Sólidos (Autoridad). Asi-mismo, alegó que Rivera Vicente violó el Canon 37 (4 L.P.R.A. Ap. IX), sobre participación del abogado en nego-cios, al examinarlo en conjunto con el Canon 21 (4 L.P.R.A. Ap. IX), relativo al deber de lealtad hacia los clientes. Ade-más, le imputó haber violado el Canon 18 (4 L.P.R.A. Ap. *354 IX), el cual exige de los abogados un trato hacia los clientes que se caracterice por la mayor diligencia y capacidad. Fi-nalmente, sostuvo que Rivera Vicente violó el Canon 38 (4 L.P.R.A. Ap. IX) al arrojar sospechas sobre sus motivacio-nes en la relación que mantenía con la Autoridad.
Luego de que Rivera Vicente sometiera su posición so-bre las alegaciones presentadas, nombramos un Comisio-nado Especial para que presidiera la vista evidenciaría, aquilatara la prueba y nos preparara un informe en el cual recogiera sus determinaciones de hechos. Examinado el in-forme correspondiente, concluimos que Rivera Vicente no incurrió en las violaciones señaladas.
Los hechos, según expuestos a continuación, surgen ma-yormente de las determinaciones fácticas del Comisionado Especial.
I
Rivera Vicente es socio propietario del Bufete Cancio, Nadal, Rivera & Díaz (Bufete) con un 30% de participación en las acciones. El 1 de enero de 1994 el Bufete suscribió un contrato de servicios profesionales con la Autoridad. Antes de suscribir el referido contrato, Rivera Vicente había comenzado a diseñar una entidad mediante la cual pudiera participar del modelo de desarrollo económico establecido por la nueva administración que entró en función a partir de las elecciones generales de noviembre de 1992. Dicho modelo de desarrollo económico pretendía, entre otras co-sas, conferirle mayor participación a la empresa privada en funciones tradicionalmente ejercidas por el Gobierno.
Los desarrolladores de la idea pretendían ofrecer servi-cios multidisciplinarios mediante un consorcio, el cual es-taría integrado por varias entidades, entre ellas, el Bufete. Originalmente se denominó “Integrated Services Partnership” (I.S.P.), pero eventualmente se incorporó bajo el nom- *355 bre de “Puerto Rico Infraestructure Management Group, Inc., PRIME”(1) (PRIME).
Más tarde, en marzo de 1995, la Autoridad adoptó lo que se denominó como el “Plan de la Infraestructura Regional para el Reciclaje y la Disposición de Desperdicios Sólidos” (Plan). Para la preparación del Plan, la Autoridad fue asesorada por consultores internos y externos, sin in-gerencia alguna del Bufete. Antes de su adopción, la Auto-ridad difundió la propuesta entre los medios de comunica-ción, los municipios y las bibliotecas del país. Además, se celebraron vistas públicas en diversos pueblos de la isla, donde la ciudadanía tuvo la oportunidad de expresarse en cuanto a su contenido.
Una vez la Autoridad adoptó el Plan, y anticipando un posible aumento en la cantidad de trabajo legal, el Bufete comenzó a hacer gestiones para ampliar los servicios pro-fesionales que le proveía a la entidad. Además, a principios de 1998, Rivera Vicente promocionó la idea de PRIME en el Gobierno. Eventualmente, el entonces Director Ejecu-tivo de la Autoridad, Ing. Daniel Pagán, mostró interés en el concepto para atender los problemas de los desperdicios sólidos en el país, porque entendía que el Gobierno no te-nía los recursos necesarios.
En septiembre de 1998, en ánimo de prepararse para la implantación del Plan, el Bufete y la Leda. Marie Code, Directora de la División Legal de la Autoridad, prepararon un modelo de contrato que serviría para comenzar la rela-ción entre la Autoridad y la entidad que se escogiera para dicha gestión. El Ledo. Pedro Maldonado Ojeda, entonces socio del Bufete, participó en la preparación del referido modelo de contrato.
Más tarde, PRIME preparó para la Autoridad —a soli-citud de ésta— una propuesta para la implantación del Plan. No obstante, la Autoridad le solicitó propuestas a *356 otras entidades, entre ellas, a E & M Group y Rosser, a las cuales se proveyó la misma información que se ofreció a PRIME. Tras evaluar las propuestas sometidas, la Autori-dad escogió a PRIME para hacerse cargo de la implanta-ción del Plan. Cuando se tomó la decisión de contratar a PRIME, la Autoridad sabía de los intereses de Rivera Vicente en la transacción y de que éste era su principal ac-cionista (con un 75% de las acciones), porque Rivera Vicente le había divulgado la información.
En vista de que PRIME había sido seleccionada para la implantación del Plan, ésta y la Autoridad comenzaron a elaborar un contrato que se conocería como “Management Assistance Service Agreement” (Contrato). Para la elabora-ción del referido Contrato, las partes partieron del modelo que había estado preparando la Autoridad, mas las nego-ciaciones conllevaron la preparación de más de cuarenta borradores.
Durante el proceso de preparación del Contrato, la li-cenciada Code se mostró preocupada de que fuera Rivera Vicente quien negociara los términos y las condiciones, ya que el Bufete era una de las entidades que componía PRIME y, por consiguiente, éste continuaría prestando ser-vicios profesionales a favor de la Autoridad. Para atender la inquietud de la licenciada Code, PRIME contrató al Ledo. Carlos Ruiz Cox para que la representara durante la negociación, de manera que el Bufete no la asistiera du-rante esa etapa. La persona contacto entre el licenciado Ruiz Cox y PRIME sería el Ledo. Pedro Santiago, Presi-dente de PRIME. Además, para evitar mayores preocupa-ciones, el Bufete optó por renunciar al contrato de servicios profesionales que tenía con la Autoridad. La renuncia se hizo por medio de una carta suscrita el 16 de noviembre de 1998 por Rivera Vicente en representación del Bufete.
Aproximadamente dos meses después —el 15 de enero de 1999— el ingeniero Pagán autorizó el otorgamiento del contrato entre PRIME y la Autoridad para el desarrollo de *357 los proyectos incluidos en el Plan. Al acto de otorgamiento comparecieron el ingeniero Pagán, en representación del Departamento de Recursos Naturales y Ambientales, la in-geniera Longoria, en representación de la Autoridad, y el licenciado Santiago, por parte de PRIME.
En el Contrato se acordó que la Autoridad autorizaba a PRIME a subcontratar a las entidades que componían el consorcio, entre ellas, al Bufete. Asimismo, se acordó que la facturación de las entidades subcontratadas se liaría a tra-vés de PRIME. El contrato disponía, además, que PRIME y sus subcontratistas observarían completa lealtad hacia la Autoridad y hacia los principios que ésta promueve. De la misma forma, se dispuso que PRIME sería responsable por el cumplimiento de los trabajos subcontratados y que no se entendería que existe un contrato entre las entidades sub-contratadas y la Autoridad.
Por otro lado, se acordó que en la subcontratación que realizaría PRIME se establecería que los subcontratistas estarían igualmente obligados al cumplimiento de las dis-posiciones del contrato entre PRIME y la Autoridad en cuanto aplicara a sus respectivos servicios. Asimismo, allí se certificó que PRIME no tenía ningún conflicto de interés o de política pública con la Autoridad. En atención a ello, el contrato proveía para el nombramiento de un Comité que se encargaría de velar por el cumplimiento de las disposi-ciones relacionadas con los conflictos de intereses.
Posteriormente, el 23 de marzo de 1999, se otorgó el contrato correspondiente entre PRIME y el Bufete como subcontratista y componente del consorcio. Al referido con-trato se le dio efecto retroactivo al 19 de enero de 1999, día en que se suscribió el Contrato con la Autoridad. En el contrato suscrito entre PRIME y el Bufete también se acordó que el Bufete le brindaría lealtad a PRIME. Se acordó, además, que el Bufete nunca le ofrecería servicios legales a PRIME.
Más tarde, ocurrió un cambio de administración, efec-tivo en enero de 2001, tras el cual la Autoridad canceló el *358 Contrato suscrito con PRIME. Eso dio lugar a que PRIME presentara una demanda contra la Autoridad por incum-plimiento de contrato ante el Tribunal de Primera Instan-cia, Sala Superior de San Juan. Cuando PRIME instó la referida demanda, la relación abogado-cliente entre el Bu-fete y la Autoridad había cesado diez meses atrás y la re-presentación legal de PRIME no la ostentó el Bufete.
El referido cambio de administración trajo consigo, ade-más, la creación de un comité denominado “Blue Ribbon Committee”, que se encargaría de investigar las transac-ciones realizadas por el gobierno anterior. El contrato en-tre PRIME y la Autoridad fue uno de los asuntos objeto de investigación por parte del referido comité, el cual remitió el asunto a la Oficina del Procurador General y al Contra-lor de Puerto Rico, quienes a su vez lo remitieron a nuestra atención.
A la luz de este trasfondo fáctico, debemos determinar si Rivera Vicente violó los Cánones 18, 21, 37 y 38 del Código de Etica Profesional, supra. Comenzaremos por analizar si Rivera Vicente violó los postulados éticos contenidos en el Canon 21 del Código de Ética Profesional, supra.
II
En lo pertinente, el Canon 21, supra, dispone, en lo pertinente:
El abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de al cliente todas las circunstancias de sus relaciones con las partes y con terce-ras personas, y cualquier interés en la controversia que pu-diera influir en el cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su jui-cio profesional pueda ser afectado por sus intereses personales.
La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación. ... Será alta-mente impropio de un abogado el utilizar las confidencias o secretos de un cliente en perjuicio de éste. (Énfasis suplido.)
*359 Como se desprende del texto citado, el Canon 21, supra, establece un deber de lealtad completa de parte del abo-gado, deber que conlleva, entre otras cosas, evitar que se incurra en conflictos de intereses. El conflicto de intereses contemplado en el Canon 21, supra, presenta tres situacio-nes que deben ser evitadas por los abogados: (1) que en beneficio de un cliente se abogue por aquello a lo que el letrado debe oponerse en cumplimiento de sus obligaciones con otro cliente (representación simultánea adversa); (2) que un abogado acepte la representación de un cliente en asuntos que puedan afectar adversamente algún interés de un cliente anterior (representación sucesiva adversa), y (3) que un abogado acepte una representación legal, o conti-núe en ella, cuando su juicio profesional pueda ser afectado por sus intereses personales. In re Avilés, Tosado, 157 D.P.R. 867 (2002); In re Sepulveda Girón, 155 D.P.R. 345 (2001). Dicho canon también contempla el potencial conflicto entre los intereses mencionados. Id.
Como parte del deber de lealtad, el Canon 21, supra, le impone al abogado la obligación de guardar las confidencias del cliente y evitar su divulgación. Asimismo, veda el uso y la divulgación de las confidencias del cliente por parte del abogado en perjuicio de éste. In re Bonilla Rodríguez, 154 D.P.R. 684 (2001); Liquilux Gas Corp. v. Berrios, Zaragoza, 138 D.P.R. 850 (1995).
Sin duda, el propósito esencial de los postulados éticos contenidos en el Canon 21, supra, es reglamentar la conducta profesional que, de alguna forma, pueda poner en peligro los principios de lealtad y confidencialidad que ca-racterizan la relación abogado-cliente. In re Avilés, Tosado, supra; In re Toro Cubergé, 140 D.P.R. 523 (1996).
Como señalamos antes, una de las modalidades de conflictos que pretende atender el Canon 21, supra, es el conflicto basado en intereses personales del abogado. Ello en vista de que el deber de lealtad que impone este canon comprende —entre otras cosas— el requisito de ejercer un *360 criterio profesional independiente y desligado de los inte-reses personales. Por lo tanto, una de las situaciones que el canon aludido proscribe es aquella en la cual el deber de lealtad que tiene el abogado para con su cliente podría ser incompatible con algún interés propio que éste también quiera promover. In re Morell, Alcover, 158 D.P.R. 791 (2003); In re Bonilla Rodríguez, supra; Liquilux Gas Corp. v. Berrios, Zaragoza, supra. En un caso donde se mani-fiesta este tipo de conflicto, el abogado está frente al dilema de cumplir, o dejar de hacerlo, con su deber de repre-sentar a su cliente de forma efectiva, por ser incompatible con la defensa de sus propios intereses. In re Sepulveda Girón, supra.
Tal como surge del texto mismo del Canon 21, supra, en los casos en que existan intereses encontrados, el deber de lealtad completa exige que el abogado divulgue todas aquellas circunstancias sobre relaciones con terceras personas que puedan afectar la relación abogado-cliente. De la misma forma, le exige al abogado divulgar cualquier interés que tenga en el asunto que se le ha encomendado.
Sobre este último requisito nos pronunciamos amplia-mente en In re Morell, Alcover, supra. En esa ocasión rei-teramos nuestra preocupación de que el juicio profesional independiente de un abogado pudiese ser afectado por su interés personal en una transacción comercial con un cliente. Allí reconocimos que en ese tipo de transacción el conflicto de interés puede surgir, no sólo de la participación personal del abogado en el negocio, sino incluso por virtud de una tercera persona jurídica que intervenga en éste, como lo sería el caso de una transacción comercial entre un cliente y una corporación en la que el abogado tenga un interés. Además, reiteramos lo resuelto en In re Toro Cubergé, supra, a los efectos de que, aún en tales casos, el abogado estará sujeto a cumplir con las cánones de ética, exigiéndose que satisfaga ciertos requisitos mínimos de divulgación y de orientación con respecto a su cliente.
*361 En particular, partiendo de la Regla Modelo 1.8(a) de la American Bar Association, resolvimos que todas las transacciones entre un cliente y su abogado deben ser justas y razonables para el cliente, y que se requiere que se le otorgue al cliente: (1) una oportunidad razonable de obtener consejo legal independiente sobre la transacción y (2) una divulgación detallada sobre la transacción, de manera que éste pueda entenderla razonablemente. En esa ocasión aclaramos que estos requisitos mínimos de divulgación no son requisitos pro forma. Tanto así que gran parte de las acciones disciplinarias bajo la Regla Modelo 1.8(a) —o su equivalente en las jurisdicciones estatales— se producen debido a la omisión de los abogados de realizar las divulgaciones necesarias. De hecho, en ese caso determinamos que los abogados querellados violaron el Canon 21, supra, precisamente por no haber cumplido con el deber de divulgación mencionado y porque no se le dio al cliente una oportunidad razonable de obtener consejo legal independiente.
A la luz de estos principios, debemos resolver tres asun-tos medulares: (1) si la transacción realizada entre la cor-poración PRIME —de la que Rivera Vicente era accionis-ta— y la Autoridad cumple con las normas establecidas sobre las transacciones entre abogado y cliente; (2) si Rivera Vicente se ubicó en un conflicto entre el deber de leal-tad hacia la Autoridad que supone la relación abogado-cliente y las obligaciones asumidas en la subcontratación entre PRIME y el Bufete, y (3) si Rivera Vicente usó confi-dencias de su cliente en peijuicio de éste. Veamos.
A. Antes de analizar la transacción ocurrida entre PRIME y el Bufete, es necesario considerar si la participa-ción del Bufete en una etapa anterior, a saber, en la redac-ción del contrato modelo que se usaría con el consorcio se-leccionado, podría entenderse como una violación del Canon 21, supra, por parte de Rivera Vicente. Para llegar a *362 una determinación a esos fines, debemos tener presente que nuestra normativa sobre conflictos imputados —como norma general— no tiene el alcance de transferirle el con-flicto de interés personal que pueda tener un abogado a los demás miembros del Bufete. Más bien, siempre que hemos hablado de conflictos imputados lo hemos hecho en el con-texto de conflictos obligacionales. Véase Liquilux Gas Corp. v. Berrios, Zaragoza, supra; P.R. Fuels, Inc. v. Empire Gas, Co., Inc., 133 D.P.R. 112 (1993).
Los conflictos obligacionales son aquellos que surgen en supuestos de representación simultánea y sucesiva adversa. Es decir, existe un conflicto de obligación cuando hay representaciones simultáneas o sucesivas de clientes donde los intereses de éstos están en conflicto con el deber de guardar confidencias que tiene el abogado con cada uno. In re Belén Trujillo, 126 D.P.R. 743 (1990). Así, pues, la prohibición sobre conflictos basados en representación simultánea y sucesiva adversa está dirigida a garantizarle “a todo cliente que las confidencias y los secretos que compartió con su abogado no serán utilizados en su contra, en beneficio de una representación antagónica, de un cliente simultáneo o posterior”. Córdova v. Larín, 151 D.P.R. 192 (2000). Véase Otaño v. Vélez, 141 D.P.R. 820 (1996). Sin embargo, en casos donde el alegado conflicto no se relaciona con representaciones simultáneas o anteriores, sino con conflictos personales, de ordinario, no se presenta el riesgo de que el abogado divulgue confidencias porque no existe dualidad de clientes. Es por eso que no le hemos aplicado los conflictos personales de un abogado a todos los miembros del bufete; únicamente le hemos imputado un conflicto de un abogado a los demás miembros cuando existe el riesgo de confidencias compartidas.(2) *363 Véase Liquilux Gas Corp. v. Berríos, Zaragoza, supra; P.R. Fuels, Inc. v. Empire Gas, Co., Inc., supra.
En este caso, precisamente, nunca hubo relación dual abogado-cliente porque —para estos fines— la Autoridad fue el único cliente del Bufete, ya que PRIME tuvo en todo momento una representación legal independiente, incluso después que terminó la relación profesional entre el Bufete y la Autoridad. Según lo anterior, debemos descartar la aplicación de las doctrinas sobre representación simultá-nea y sucesiva adversa a los hechos que nos ocupan.
Las imputaciones sobre intereses encontrados que pre-senta este caso se relacionan, más bien, con los intereses personales de Rivera Vicente en el esquema que dio lugar al contrato entre PRIME y la Autoridad. De acuerdo con, y tomando en cuenta la normativa antes esbozada, debemos concluir que no se configuró una violación al Canon 21, supra, en la etapa de la redacción del contrato modelo, ya que el conflicto personal lo acarreaba únicamente Rivera Vicente y él no participó en dicha encomienda legal.
La infracción al Canon 21, supra, que hubiera podido ocurrir se hubiera basado en el incumplimiento con el de-ber de divulgación y representación legal independiente, mas en esa etapa no había interés que divulgar, porque el Bufete no tenía un interés personal en la encomienda. Rei-teramos que dicho interés lo poseía, únicamente, Rivera Vicente, quien no se lo transfirió a los demás miembros del Bufete y quien, además, no participó en la gestión aludida.
Conforme a lo anterior, y tomando en cuenta que en este caso no existe un problema de representación simultánea o sucesiva adversa, sino de conflictos basados en los intere- *364 ses personales de un abogado, concluimos que los inciden-tes anteriores a la transacción entre PRIME y la Autoridad —en específico, la redacción del contrato modelo realizada por el Bufete— no representa una violación al Canon 21, supra, por parte de Rivera Vicente.
Aclarado lo anterior, pasemos a analizar la transacción ocurrida entre PRIME y la Autoridad. Primero, debemos tener presente que para la fecha en que PRIME le hizo la propuesta a la Autoridad para implementar el Plan, el Bufete aún tenía vigente un contrato de servicios profesionales con dicha entidad. Aunque para esa fecha todavía no se había cumplido con el trámite de incorporación de PRIME, lo cierto es que —de todas maneras— la existencia de una persona jurídica no exime al abogado de los rigores éticos contenidos en el Canon 21, supra. En In re Morell, Alcover, supra, nos expresamos a esos efectos y resolvimos que cuando se realiza una transacción entre una corporación en la que el abogado tiene un interés y el cliente, se activan los requisitos de divulgación dispuestos en el Canon 21, supra.
En vista de que Rivera Vicente —como miembro del Bu-fete— era representante legal de la Autoridad para el mo-mento en que se iniciaron las negociaciones para contratar con la entidad de la que él era accionista, tenemos que evaluar si la transacción en cuestión cumplió con los requi-sitos necesarios para evitar la infracción al Canon 21, supra, en la modalidad de conflicto por intereses personales del abogado. Con ese propósito debemos determinar si la transacción en cuestión fue justa y razonable para la Autoridad. En particular, es preciso examinar si dicha en-tidad tuvo una oportunidad razonable de obtener el consejo legal independiente sobre la transacción y si Rivera Vicente le ofreció una divulgación detallada sobre ésta y so-bre su relación con PRIME.
Según se desprende de la determinaciones de hechos del Comisionado Especial, el propio Rivera Vicente le hizo a la *365 Autoridad la divulgación necesaria sobre su relación con PRIME y sobre los conflictos que eso pudiera acarrear en la relación abogado-cliente. De la misma forma, se deter-minó que la Autoridad no fue asesorada por el Bufete du-rante la negociación del Contrato con PRIME, sino que tuvo representación legal independiente en todo momento. Conforme a ello, concluimos que la Autoridad fue debida-mente informada sobre los intereses de Rivera Vicente en la transacción y tuvo una oportunidad razonable de obte-ner el consejo legal independiente antes de realizarla.
Por otro lado, el Comisionado Especial determinó que fue la propia Autoridad quien se interesó en la idea de PRIME para trabajar el problema de los desperdicios sóli-dos en el país y fue a petición suya que se le presentó la propuesta. De sus determinaciones surge, además, que la Autoridad vio en PRIME un mecanismo eficaz para im-plantar los pormenores del Plan, a la vez que lograba ha-cerse partícipe de la política pública diseñada por la admi-nistración entonces vigente, a los efectos de incluir al sector privado en actividades tradicionalmente realizadas por el Gobierno. Asimismo, se desprende que la Autoridad expresó estar satisfecha con los servicios rendidos por PRIME y entendió que su trabajo fue bueno. Por lo tanto, no existen indicios de que la transacción realizada por PRIME y la Autoridad redundara en peijuicio de ésta ni de que fuera injusta o irrazonable.
A la luz de todo lo anterior, entendemos que se cumplen en este caso los requisitos establecidos para asegurar la razonabilidad de la transacción entre abogado y cliente. Por ende, no encontramos infracción al Canon 21, supra, en cuanto a este asunto.
B. Debemos resolver, por otra parte, si la relación contractual entre PRIME y el Bufete ubicó a Rivera Vicente en un conflicto o potencial conflicto entre su deber de lealtad hacia la Autoridad y las obligaciones asumidas con PRIME como subcontratista. Para atender este asunto, *366 conviene tener en mente que el Canon 21, supra, contem-pla que un abogado sea contratado por un tercero para ofrecer servicios legales a determinado cliente y que, in-cluso, sea ese tercero quien pague sus honorarios. En tales casos, el cliente es la persona cuyo interés representa el abogado, aunque haya sido un intermediario quien contrató con él. Véase In re Semidey Morales, 151 D.P.R. 842 (2000).
En el caso que nos ocupa, precisamente, un intermedia-rio (PRIME) contrató al Bufete para que le rindiera servi-cios legales a la Autoridad y los honorarios correspondien-tes los pagaría este intermediario. Ahora bien, el Procurador General alega que dicho esquema produjo una infracción al Canon 21, supra, porque el Bufete estaba obli-gado con cada uno de los principales contratantes. Por un lado, era subcontratista de PRIME y, por otro lado, era representante legal de la Autoridad. El Procurador General alega que tales obligaciones son incompatibles. No es-tamos de acuerdo.
Ciertamente, la relación abogado-cliente conlleva que el abogado despliegue completa lealtad hacia su cliente y, por su parte, la relación del Bufete con PRIME también supo-nía cierto grado de lealtad. No obstante, nada en el expe-diente indica que ambas exigencias fueran incompatibles. Por el contrario, notamos que en el Contrato suscrito con la Autoridad, PRIME se obligó a serle leal a la Autoridad y a requerir lo mismo de parte de sus subcontratistas. En efecto, el Bufete —como subcontratista de PRIME— se obligó a ser leal a PRIME y a cumplir con todo aquello a lo que ésta se hubiera obligado. Por lo tanto, si bien el Bufete se obligó a serle leal a PRIME, lo cierto es que ésta —a su vez— se obligó a sí misma y a sus subcontratistas a ser leal a la Autoridad. En vista de ello, sostenemos que no ocurrió un desvío de la lealtad que merecía la Autoridad.
Ahora bien, tal como lo contempla el propio Canon 21, supra, siempre existe la posibilidad de que surja *367 un conflicto entre la persona que contrató los servicios le-gales y la persona que, en efecto, los recibe. En tales cir-cunstancias, procede que el abogado no represente a nin-guno de ellos. En específico, el canon aludido dispone que “[c]uando un abogado representa a un cliente por enco-mienda de otra persona o grupo, quien le paga al abogado por dicho servicio, debe renunciar la representación de am-bos tan pronto surja una situación de conflicto de intereses entre la persona o grupo que le paga sus honorarios y la persona a quien representa”. (Enfasis suplido.) 4 L.P.R.A. Ap. IX, C. 21.
En este caso, sin embargo, mientras existió la relación abogado-cliente, no ocurrió ningún conflicto entre PRIME y la Autoridad.(3) Además, en previsión a cualquier con-flicto potencial y en cumplimento con las pautas estableci-das en el Canon 21, supra, las partes acordaron que el Bufete nunca representaría legalmente a PRIME. Incluso, para evitar mayores dudas, Rivera Vicente se mantuvo a una distancia prudente desde el inicio mismo de las nego-ciaciones y PRIME optó por contratar los servicios profe-sionales del licenciado Ruiz Cox para que lo representara en lo concerniente a dicha relación contractual. Por su parte, el licenciado Ruiz Cox no discutió con Rivera Vicente los pormenores de la negociación, sino que realizó las co-municaciones necesarias con PRIME a través de su Presi-dente, el licenciado Santiago.
Conforme a lo anterior, debemos concluir que la relación contractual entre el Bufete y PRIME no levantó ni pudo levantar —en las circunstancias de este caso— un conflicto de intereses que le impidiera a Rivera Vicente ejercer un juicio profesional libre de ataduras y cumplir con el deber de lealtad que supone la relación abogado-cliente.
C. Finalmente, también relacionado con las pautas *368 éticas establecidas en el Canon 21, supra, debemos deter-minar si Rivera Vicente usó confidencias de su cliente en perjuicio de éste. El Procurador General aduce que Rivera Vicente violó el canon mencionado al utilizar información confidencial surgida de su relación abogado-cliente con la Autoridad para presentar la propuesta de PRIME y que, por lo tanto, utilizó dicha información para beneficio propio. Su contención se basa en el hecho de que, por su relación con la Autoridad, el Bufete conocía de la existencia del Plan y de lo que la Autoridad esperaba de los posibles proveedores.
Ahora bien, de las determinaciones de hechos realizadas por el Comisionado Especial surge que el Bufete no parti-cipó en la elaboración del Plan cuya implementación le fuera adjudicada eventualmente a PRIME. También surge de dichas determinaciones que antes de adoptar el Plan, la Autoridad difundió la propuesta en los medios de comuni-cación y celebró vistas públicas en diversos pueblos de la isla para que la ciudadanía se expresara en cuanto a su contenido. Además, de las determinaciones fácticas se des-prende que la Autoridad le proveyó a otras dos entidades la misma información que se le dio a PRIME para someter la propuesta para la implantación del Plan. Conforme a lo anterior, debemos concluir —tal como lo hizo el Comisio-nado Especial— que los pormenores del Plan y los intere-ses de la Autoridad con respecto a éste eran de conoci-miento público.
Por otro lado, debemos enfatizar que lo que prohíbe el Canon 21, supra, es que los secretos o las confidencias del cliente sean usados por el abogado en perjuicio de éste. La Regla Modelo 1.8(b) de la American Bar Association contiene una norma similar a la nuestra, donde se establece que “[u]n abogado no debe utilizar información relacionada con la representación de un cliente en peijuicio de éste ...”. (Traducción nuestra.) ABA, supra, R. 1.8(b), pág. 37. En el comentario correspondiente se aclara que la regla *369 pretende evitar, por ejemplo, que un abogado que conoce el interés de su cliente en comprar y desarrollar unas parce-las de terreno, use esa información para comprar una par-cela para competir con el cliente o para recomendárselo a un tercero.(4) Íd., pág. 39.
En este caso no existe prueba en el expediente que nos lleve a concluir que Rivera Vicente utilizó el conocimiento que tenía sobre los detalles del Plan y los intereses de la Autoridad en perjuicio de ésta. Por el contrario, de las de-terminaciones de hechos del Comisionado Especial surge que la Autoridad escogió la propuesta de PRIME porque encontró que respondía a sus intereses. Asimismo, se de-terminó que la Autoridad se sintió complacida con los ser-vicios rendidos por PRIME para la implantación del Plan. Conforme a lo anterior, entendemos que no existe prueba suficiente para concluir que Rivera Vicente usó informa-ción confidencial surgida de la relación abogado-cliente para perjudicar a la Autoridad.
Por las razones expuestas, concluimos que no existe prueba clara, robusta y convincente para determinar que Rivera Vicente violó el Canon 21 del Código de Ética Profesional, supra, en los diversos aspectos discutidos.
III
Analicemos ahora si Rivera Vicente actuó en contraven-ción a los postulados éticos contenidos en el Canon 37 del Código de Ética Profesional, supra. En específico, debemos resolver si su participación en el desarrollo de PRIME y la ulterior contratación de ésta con la Autoridad tuvo como fin directo o indirecto proporcionarle trabajo profesional lucrativo que de otra forma no hubiese obtenido.
El Canon 37 establece que la participación del *370 abogado en negocios o actividades comerciales no es propia de la buena práctica de la abogacía “si tal negocio o activi-dad tiene el fin directo o indirecto de proporcionarle tra-bajo profesional lucrativo que de otra forma el bufete no hubiese obtenido”. 4 L.P.R.A. Ap. IX, C. 37. Así pues, un abogado puede dedicarse a actividades ajenas a su profe-sión y nuestra jurisdicción disciplinaria no se extiende a ese ámbito, a menos que se realice con “ ‘el fin directo o indirecto de proporcionarle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido’ ”. In re Belén Trujillo, supra, pág. 756. Véanse: In re Roldán Figueroa, 106 D.P.R. 4 (1977); In re Clavell Ruiz, 106 D.P.R. 257 (1977).
Evidentemente, para determinar si se ha configurado una violación al Canon 37, supra, es preciso analizar las razones que pudieron haber movido a un abogado a participar en determinada actividad de negocios o de índole comercial. En este caso, conforme surge de los hechos determinados por el Comisionado Especial, Rivera Vicente ideó el concepto de PRIME antes de comenzar la relación profesional con la Autoridad, y lo hizo para participar del modelo de desarrollo económico propulsado por la administración entonces vigente. De las determinaciones fácticas se deduce, además, que para la fecha en que se suscribió el contrato entre PRIME y la Autoridad ya el Bufete tenía vigente un contrato de servicios legales con esta última. Por lo tanto, si bien PRIME le proveyó al Bufete trabajo profesional, lo cierto es que no se cumple el segundo elemento requerido por el Canon 37, supra, a saber, que sea trabajo que de otra forma no hubiese obtenido.
Determinar que la creación de PRIME y su ulterior con-tratación con la Autoridad obedeció al interés de proporcio-narle al Bufete trabajo legal que, de otra forma, no hubiera obtenido, requeriría un análisis altamente especulativo. Ello porque —como dijimos antes— el Bufete ya tenía un *371 contrato de servicios profesionales con la Autoridad y no existen razones para sostener que la Autoridad pretendía terminarlo. En consecuencia, no podemos sostener que la actividad realizada por Rivera Vicente a través de PRIME le proporcionó al Bufete un trabajo profesional que, de otra forma, no hubiera obtenido. Por ende, concluimos que no se configuró una infracción al Canon 37 del Código de Etica Profesional, supra.
IV
Por otro lado, es preciso resolver si Rivera Vicente desplegó falta de diligencia y capacidad en su desempeño como abogado de la Autoridad. En lo pertinente, el Canon 18 del Código de Etica Profesional dispone que es deber del abogado defender los intereses del cliente diligentemente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica estime adecuada y responsable. 4 L.P.R.A. Ap. IX, C. 18. El Procurador General alega que Rivera Vicente no cumplió con las exigencias de este Canon toda vez que su relación profesional con la Autoridad no se caracterizó por la mayor diligencia ni la más completa honradez.
No obstante, entendemos que no existe prueba sufi-ciente para concluir que Rivera Vicente desplegó falta de diligencia en su relación profesional con la Autoridad. Por el contrario, de la prueba creída por el Comisionado Especial surge que —a través del Bufete— Rivera Vicente cum-plió con la diligencia requerida por la relación abogado-cliente, al punto de que la Autoridad siempre estuvo satisfecha con su desempeño. El Comisionado Especial también entendió que no se presentó prueba clara, robusta y convincente con respecto a esta alegación. Puesto que se trata de una determinación basada en la suficiencia de la prueba presentada, no estamos en posición de distanciar-nos de la conclusión del Comisionado Especial.
*372 V
Finalmente, debemos resolver si Rivera Vicente incurrió en una apariencia de conducta impropia y si no cumplió con el deber de exaltar el honor y la dignidad de la profe-sión, según lo prescribe el Canon 38 del Código de Etica Profesional, supra.
Respecto a los deberes mencionados, el referido Canon 38 establece: “[e]l abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia.” 4 L.P.R.A. Ap. IX, C. 38. Al interpretar este canon hemos sostenido que cada abogado es un “espejo donde se refleja la imagen de la profesión”, que se debe representar con limpieza, con lealtad y con “el más escrupuloso sentido de responsabilidad In re Quiñones Ayala, 165 D.P.R. 138, 145 (2005). Es por eso que debe cuidarse de que sus actuaciones no den margen a la más leve sospecha de impropiedad. Esta normativa responde al hecho de que la mera apariencia de conducta impropia puede resultar perniciosa, minando el respeto de la ciudadanía por sus instituciones de justicia y la confianza de los clientes en sus abogados. In re Vega Morales, 167 D.P.R. 331 (2006).
Por lo tanto, al evaluar la conducta de Rivera Vicente a la luz de esta normativa, debemos examinar si éste evitó hasta la apariencia de infracción a los cánones del Código de Ética Profesional. Como mencionamos, Rivera Vicente se mantuvo a distancia durante la transacción ocurrida en-tre PRIME y la Autoridad para evitar cualquier duda con respecto a la transparencia del proceso. Asimismo, con idénticos fines, Rivera Vicente suscribió una renuncia de parte del Bufete al contrato de servicios profesionales que mantenían con dicha entidad.
Por otra parte, notamos que durante las negociaciones *373 Rivera Vicente procuró no aportar a la representación legal de PRIME, razón por la cual contrató los servicios profe-sionales del licenciado Ruiz Cox. Para conferirle mayor pu-reza a la transacción, Rivera Vicente también se ocupó de que los pormenores de la negociación entre el licenciado Ruiz Cox (como representante legal de PRIME) y la Auto-ridad no se le informaran a PRIME a través de él, sino por medio del Ledo. Pedro Santiago, Presidente de PRIME. Además, durante dicho trámite Rivera Vicente se encargó de hacerle a la Autoridad una completa divulgación sobre sus intereses económicos en PRIME y se aseguró de que ésta tuviera un consejo legal independiente. Finalmente, vimos que en la subcontratación entre PRIME y el Bufete —del que Rivera Vicente es socio propietario— se acordó que el Bufete nunca representaría a PRIME y que, incluso, luego de haber finalizado la relación profesional con la Au-toridad, el Bufete optó por no representar a PRIME en un litigio que se trabó posteriormente entre ésta y la Autoridad.
De lo anterior se desprende que Rivera Vicente empleó medidas cautelares para evitar incurrir, no sólo en la ver-dadera impropiedad ética, sino también en la apariencia de impropiedad. En vista de ello, entendemos que no existe la prueba clara, robusta y convincente requerida para demos-trar que Rivera Vicente violó el Canon 38 del Código de Etica Profesional, supra.
VI
Por los fundamentos que preceden, resolvemos que no se cumplió con el estándar probatorio requerido para de-mostrar que Rivera Vicente incurrió en las faltas imputadas. En consecuencia, desestimamos la querella presentada en su contra y ordenamos el archivo del asunto.

Se dictará sentencia de conformidad.

*374 La Jueza Asociada Señora Fiol Matta disintió con una opinión escrita.

 “Puerto Rico Infraestructure Management Group, Inc., PRIME” (PRIME) fue incorporada el 16 de octubre de 1998 por el Ledo. Rubén Medina Lugo, miembro del Bufete.

 La Regla Modelo 1.10(a) de la American Bar Association, sobre imputación de conflictos de interés, establece una norma similar. Ésta dispone que mientras los *363 abogados están asociados a una firma, no pueden representar a un cliente cuando alguno de ellos, de haber estado practicando solo, estaría impedido de hacerlo, a menos que la prohibición se base en intereses personales y no presente el riesgo de limitar significativamente la representación del cliente por los demás miembros de la firma. ABA Model Rules of Professional Conduct R. 1.10(a), pág. 47 (ed. 2006). Por lo tanto, según dicha regla, los conflictos de intereses personales, de ordinario, no se le imputan a otros miembros del bufete.

 El único conflicto que consta en el expediente surgió mucho después de haber cesado la relación abogado-cliente, cuando se produjo un litigio entre PRIME y la Autoridad. Aún en dicho litigio PRIME no fue representada por el Bufete.

 Véase además, para fines ilustrativos, Matter of Swihart, 517 N.E.2d 792 (Ind. 1988); In re Jordan, 712 P.2d 97 (Or. 1985); In re Nigohosian, 442 A.2d 1007 (N.J. 1982); Matter of Nulle, 620 P.2d 214 (Ariz. 1980).