*In re* RAFAEL TORO CUBERGÉ, querellado.

*Número:* CP-91-268        *Resuelto:* 2 de abril de 1996

L.P.R.A. sec. 4592.

*Jorge E. Pérez Díaz, Procurador General, Anabelle Rodríguez, Subprocuradora General, e Yvonne Casanova Pelosi, Procuradora General Auxiliar,* abogados de El Pueblo; *Arturo Negrón García,* abogado del querellado; *Rafael Toro Cubergé, pro se.*

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

I

Los hechos esenciales del caso ante nos, según se desprenden de los documentos que obran en autos, se relatan a continuación.

El Lic. Rafael Toro Cubergé fue contratado como asesor legal del Municipio de Yauco, a jornada parcial, en 1981.

El 25 de septiembre de 1983 la Asamblea Legislativa de Puerto Rico asignó al Municipio de Yauco la cantidad de $400,000 para la construcción de un parque de pelota urbano, incluyendo la adquisición de los terrenos necesarios para ello.

Unos meses antes, el 3 de marzo de 1983, el licenciado Toro Cubergé solicitó al Departamento de Hacienda (en adelante Hacienda) que se liberaran unas fincas suyas de los embargos que las gravaban por razón de una deuda contributiva que Toro Cubergé tenía pendiente. Para propiciar la liberación de los embargos referidos, Toro Cubergé ofreció otorgarle a Hacienda unos pagarés con garantía hipotecaria sobre otras dos propiedades suyas.

Hacienda aceptó la transacción propuesta, por lo que Toro Cubergé, el 24 de marzo de 1983, suscribió dos pagarés al portador con escrituras de hipotecas voluntarias sobre las otras fincas y se comprometió a inscribirlas en el Registro de la Propiedad.

En 1986, una de las fincas (de 35.36 cuerdas) que había sido liberada del gravamen por Hacienda fue vendida por Toro Cubergé a su hija y al esposo de ésta por $30,000. En junio de 1987 Toro Cubergé y su esposa readquirieron dicha finca de su hija y su esposo mediante compra por $24,500.

El 5 de agosto de 1987 Toro Cubergé organizó la corporación PIMAR junto con dos empleados suyos y un amigo personal. Desde sus inicios, Toro Cubergé era el dueño absoluto de PIMAR y tenía pleno control de sus transacciones, incluyendo el control de sus fondos. Admitidamente, se trataba de un álter ego de Toro Cubergé.

El 30 de septiembre de 1987 PIMAR le compró a Toro Cubergé y a su esposa la finca de 35.36 cuerdas antes aludida, que había sido liberada de gravamen contributivo por Hacienda en 1983. El precio de venta fue $24,500.

Mientras tanto, el 30 de abril de ese mismo año, el Estado Libre Asociado demandó a Toro Cubergé para el cobro

del dinero por la deuda contributiva antes mencionada, que aún estaba pendiente. Salió a relucir entonces que Toro Cubergé, contrario a su compromiso con Hacienda, no había inscrito las hipotecas que garantizaban los pagarés otorgados en 1983 para obtener la liberación del gravamen que obraba contra las fincas suyas.

Así las cosas, el 1ro de agosto de 1988, siendo aún Toro Cubergé asesor legal del Municipio de Yauco, PIMAR le vendió a dicho municipio la finca que ésta había adquirido el 30 de septiembre de 1987. Esta finca habría de usarse para la ubicación del parque de pelota, para el cual existían fondos legislativos desde 1983. El precio de venta fue $391,976, que era el valor en el mercado de la propiedad.

El 15 de septiembre de 1989, Hacienda le notificó a Toro Cubergé que, a partir de diciembre de ese año, le embargaría el sueldo que devengaba en el Municipio de Yauco para comenzar a cobrar la deuda contributiva que aún continuaba pendiente.

El 31 de octubre de 1989, un asambleísta municipal presentó una querella jurada contra Toro Cubergé por razón de los hechos antes relatados.

El 31 de diciembre de 1989 Toro Cubergé renunció a su contrato como asesor legal del Municipio de Yauco.

El 2 de abril de 1991 el Procurador General de Puerto Rico rindió su primer informe ante nos en relación a este caso. El 29 de abril de ese mismo año, atendiendo nuestra resolución a tales fines, el Procurador General presentó ante nos una querella y formuló los cargos siguientes contra el abogado Rafael Toro Cubergé:

*PRIMER CARGO*: El Lcdo. Rafael Toro Cubergé violó el Canon 21 de Etica Profesional, el cual prohíbe a todo abogado incurrir en una dualidad de funciones que propicien intereses encontrados entre el abogado y su cliente.

*SEGUNDO CARGO*: El Lcdo. Rafael Toro Cubergé violó el Canon 38 de Etica Profesional, el cual obliga a todo abogado preservar el honor y la dignidad de la profesión de la abogacía y de desempeñarse en forma digna y honorable tanto en su vida profesional como en su vida privada.

El querellado presentó su contestación a la querella el 3 de febrero de 1992. En la misma fecha, el querellado presentó una moción mediante la cual solicitaba a designación de un Comisionado Especial (en adelante Comisionado) para atender la querella. El 6 de marzo de 1992 aceptamos esa solicitud y designamos un Comisionado.

Luego de los trámites de rigor, y previo un examen de la prueba documental estipulada por las partes, el Comisionado Víctor M. Ramírez Morell nos sometió su informe el 26 de septiembre de 1995. En sus determinaciones de hecho nos indica, además de lo ya relatado, que para el 22 de diciembre de 1992 la deuda contributiva del querellado era de $707,198.36, sin incluir su deuda relacionada con contribuciones de la propiedad.

El Comisionado también formuló las conclusiones siguientes:

1. El querellado vendió y luego compró unos terrenos en 1987 y el mismo año los vendió a su corporación PIMAR. En 1988, siendo el querellado Asesor del Municipio de Yauco, la corporación PIMAR vendió los mismos terrenos al Municipio de Yauco. Aunque las partes estipularon que el precio de venta era similar al precio en el mercado, es aparente que en esta transacción había intereses encontrados entre la posición del querellado como Asesor Legal del Municipio de Yauco que era su cliente, y su posición y control de la corporación PIMAR. Además, la venta realizada por el querellado de sus terrenos a la corporación PIMAR podría impedir que el Departamento de Hacienda le gravara los mismos para el cobro de su deuda contributiva. Estas transacciones del querellado revelan un incumplimiento con la conducta que requiere el Canon 21 de Ética Profesional. 2. Es evidente que su deuda contributiva con el erario y su tardanza en cumplir con su promesa de inscribir en el Registro de la Propiedad las hipotecas voluntarias que produjeron el levantamiento de embargos de sus propiedades por el Departamento de Hacienda, es una conducta contraria a la conducta de un abogado que requiere el Canon 38 del Código de Ética Profesional.

El 27 de noviembre de 1995, luego de varias prórrogas, el querellado impugnó las conclusiones formuladas por el Comisionado. En cuanto a la primera, adujo que no hay

prueba alguna que demuestre que el querellado haya asesorado al Municipio de Yauco con respecto a la transacción en cuestión. Tampoco sirvió de notario en ésta. Aduce, además, que no hay prohibición alguna que impida al Municipio hacer negocios con personas que le prestan servicios, y que el Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, sobre intereses encontrados no abarca situaciones como la de marras.

En cuanto al segundo cargo, el querellado aduce, en esencia, que el Canon 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, no puede interpretarse "como un vehículo sumario de cobro de contribuciones" y que Hacienda tiene medios suficientes para tramitar el pago de deudas contributivas.

El Procurador General, por su parte, compareció mediante un breve y escueto escrito para informarnos que "coincide con la totalidad de las determinaciones de hecho" formuladas por el Comisionado.

Pasamos a resolver.

## II

El Canon 21 del Código de Ética Profesional, *supra*, que rige la conducta de los abogados de Puerto Rico, está concretamente dirigido a evitar que el abogado incurra en la representación de intereses encontrados. Dicho canon contempla principalmente tres situaciones particulares que deben evitarse; a saber:

(1) Que, en beneficio de un cliente, se abogue por aquello a lo que el letrado debe oponerse, en cumplimiento de sus obligaciones para con otro cliente. Tal situación presupone la representación *simultánea* de dos clientes distintos, cuyos intereses llegan a contraponerse, como sucedió en: *In re Soto*, 134 D.P.R. 772 (1993); *Pueblo v. Padilla Flores*, 127 D.P.R. 698 (1991); *Ortiz v. Soliván Miranda*, 120 D.P.R. 559 (1988); *In re Roldán González*, 113 D.P.R. 238 (1982);

*In re Rodríguez Torres*, 104 D.P.R. (1976). Véase, además, *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172 (1985).

(2) Que un abogado acepte la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de un cliente anterior. Esta situación se refiere a la representación *sucesiva* de distintos clientes, cuyos intereses llegan a contraponerse, como sucedió en: *In re Peña Clos*, 135 D.P.R. 590 (1994); *In re Orlando Roura*, 119 D.P.R. 1 (1987); *In re Concepción Suárez*, 111 D.P.R. 486 (1981); *In re Guzmán*, 80 D.P.R. 713 (1958). Véanse, también: *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, 133 D.P.R. 112 (1993); *K-Mart Corp. v. Walgreens of P.R., Inc.*, 121 D.P.R. 633 (1988).

En las dos situaciones anteriores el abogado no sólo está impedido en general de representar intereses encontrados, sino que, además, se le prohíbe en específico divulgar secretos o confidencias de algún cliente suyo. Es decir, tanto en situaciones de representación simultánea como de representación sucesiva, la divulgación de secretos o confidencias de cualquier cliente constituye una particular violación al Canon 21 del Código de Ética Profesional, *supra*. Tal divulgación es una instancia concreta, la más clara, de intereses encontrados que el canon prohíbe. *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778 (1984).

(3) Finalmente, el canon en cuestión prohíbe que un abogado acepte una representación legal, o que continúe en ella, cuando su juicio profesional pueda ser afectado por sus intereses personales. Hemos señalado antes que esta vertiente del citado Canon 21 exige que el abogado ejerza un criterio profesional independiente y desligado de intereses personales. La situación que se debe evitar es aquella en la cual el deber de lealtad completa que tiene el abogado para con su cliente puede ser incompatible con algún interés propio que el abogado también quiera promover o defender. *Liquilux Gas Corp. v. Berríos, Zaragoza*, 138

D.P.R. 850 (1995); *In re Belén Trujillo*, 126 D.P.R. 743 (1990).

Amparados en esta particular prohibición del Canon 21 del Código de Ética Profesional, *supra*, hemos considerado impropio que un abogado representase unos clientes que tenían interés en obtener determinados servicios de una entidad que dicho abogado presidía. *In re Belén Trujillo*, supra. Igualmente, hemos resuelto que es contrario a la ética profesional que un abogado represente a un cliente en un litigio de ejecución de hipoteca contra éste cuando dicho abogado era el dueño de una compañía de fianzas que garantizaba al cliente y que a su vez tenía interés en los bienes que eran objeto del litigio. *In re Martínez Rivera*, 106 D.P.R. 239 (1977). Asimismo, hemos considerado que es incompatible que un abogado autorice documentos de compraventa en situaciones en las cuales la entidad que presta el dinero para ésta pertenece a dicho abogado. *In re Cancio Sifre*, 106 D.P.R. 386 (1977). También hemos considerado contrario al contenido deontológico del citado Canon 21 del Código de Ética Profesional que un abogado asuma una conducta pasiva con su cliente con respecto a la inversión de dinero hecha por éste en una entidad financiera de la cual el abogado es también asesor legal y accionista. *In re Pizarro Santiago*, 117 D.P.R. 197 (1986).

Todas las decisiones nuestras, citadas en el párrafo anterior, tienen en su raíz un mismo criterio fundamental. Lo señalamos con claridad en *In re Carreras Rovira y Suárez Zayas*, supra. Se refiere "a la imposibilidad legal de simultanear dos o más cargos, funciones o misiones una misma persona. ... La premisa es sencilla: quien no sea independiente no está en condiciones de ejercer la profesión. ... De este modo se busca preservar la autonomía de juicio del abogado y prevenir cualquier tipo de dilución a la fidelidad que debe a su cliente". Íd., págs. 788–789.

## III

Otras decisiones nuestras, emitidas al amparo del Canon 38 del Código de Ética Profesional, *supra*, son también pertinentes al asunto de los intereses encontrados. En *In re Rojas Lugo*, 114 D.P.R. 687 (1983), establecimos que era incompatible que un abogado ejerciese como litigante ante el Fondo del Seguro del Estado mientras tal abogado ocupaba el cargo de presidente de la unión que agrupaba a los empleados de dicha entidad. Igualmente, en *García O'Neill v. Cruz*, 126 D.P.R. 518 (1990), resolvimos que era incompatible que un abogado representara clientes en un pleito contra un municipio cuando ese abogado era miembro de su asamblea municipal. Recientemente, en *In re Colón Ramery*, 133 D.P.R. 555 (1993), e *In re Colón Ramery*, 138 D.P.R. 793 (1995) (en reconsideración), decidimos que un abogado, quien como notario autorizó un instrumento público, está impedido de representar a cualquiera de los otorgantes en algún pleito instado para reclamar las contraprestaciones acordadas en el instrumento público referido. En todos estos casos nuestro dictamen se fundamentó en gran medida en la exigencia del Canon 38 del Código de Ética Profesional, *supra*, en cuanto a que el abogado "deb[e] esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales, *y debe evitar hasta la apariencia de conducta profesional impropia*". (Énfasis suplido.) En dichos casos hicimos hincapié en que el abogado tiene "el deber de lucir puro y libre de influencias extrañas a su gestión profesional", y que "en el descargo de sus responsabilidades profesionales, debe cuidarse de que sus actuaciones no den margen a la más leve sospecha" de que promueve intereses suyos encontrados con los de su cliente.

En efecto, en numerosas ocasiones y en contextos muy variados hemos recalcado que el abogado tiene el de-

ber de evitar la apariencia de impropiedad en el desempeño de sus labores profesionales. Además de los tres casos citados en el párrafo anterior, véanse: *In re Rodríguez Torres*, supra; *In re Meléndez Pérez*, 104 D.P.R. 770 (1976); *In re Cancio Sifre*, supra; *In re Roldán González*, supra; *In re Félix*, 111 D.P.R. 671 (1981); *In re Carreras Rovira y Suárez Zayas*, supra; *In re Pizarro Santiago*, supra; *In re Peña Clos*, supra; *Fed. Pesc. Playa Picúas v. U.S. Inds., Inc.*, 135 D.P.R. 303 (1994); *Liquilux Gas Corp. v. Berríos, Zaragoza*, supra. Fundamentados en esta consideración medular sobre la necesidad de evitar la apariencia de impropiedad, hemos resuelto incluso que en *casos de dudas* sobre un posible conflicto de intereses, o en que el conflicto de intereses impermisible sólo sea *potencial*, el abogado está también en la obligación de renunciar a la representación legal del cliente afectado. *In re Valentín González*, 115 D.P.R. 68 (1984); *In re Carreras Rovira y Suárez Zayas*, supra; *Sánchez Rodríguez v. López Jiménez*, supra; *In re Belén Trujillo*, supra; *Fed. Pesc. Playa Picúas v. U.S. Inds., Inc.*, supra.

IV

Con arreglo a la normativa expuesta en las partes II y III de esta opinión, no cabe duda de que el querellado faltó a la ética profesional al continuar como asesor legal del Municipio de Yauco, una vez habían iniciado las gestiones que dieron lugar a la compra por dicho municipio de la finca que el querellado poseía a través de su álter ego, la corporación PIMAR.(¹) El evidente interés del querellado

---

(¹) Como así fue admitido por el propio querellado en sus escritos, partimos de la premisa de que el querellado y PIMAR son la misma persona; es decir, que es correcto el señalamiento del Procurador General, y la determinación de hecho del Comisionado, de que PIMAR era un álter ego del querellado. Por ello, no examinamos en esta opinión la obligación que hubiese tenido el querellado, según el Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, de divulgar al Municipio de Yauco, su cliente, todas las circunstancias de su relación con PIMAR.

De haber sido PIMAR una corporación auténtica y el querellado sólo un accionista de ésta, el abogado hubiese tenido que revelarle a su cliente en detalle cuál era su relación con la corporación, qué intereses tenía él en la transacción, cómo podía

en venderle la finca en cuestión a su cliente, el Municipio de Yauco, puso en riesgo su independencia profesional y el deber de completa lealtad que tenía hacia éste. No importa aquí que el querellado no haya asesorado al Municipio sobre la transacción aludida. La situación de conflicto surgía de que el querellado tenía dos relaciones simultáneas con el Municipio: una como su abogado y otra como vendedor. Su juicio profesional podía ser afectado por su interés personal en que el cliente adquiriese su propiedad. Es precisamente esa dualidad de relaciones, que puede influir en la gestión profesional y diluir la fidelidad que se le debe al cliente, lo que el Canon 21 del Código de Ética Profesional, *supra*, prohíbe en la tercera vertiente identificada antes.

Más aún, no cabe duda alguna de que el interés del querellado en venderle su finca a su cliente creó una apariencia de influencia indebida, que por sí sóla era contraria a lo contemplado en el Canon 38 del Código de Ética Profesional, *supra*, según hemos señalado antes. Fue por ello que un miembro de la Asamblea Municipal se quejó ante nos. El querellado, quien estaba sujeto a actuar en todo momento con celo, cuidado y prudencia, y quien debía estar consciente de la importancia de la apariencia como un elemento importante de su proceder profesional, debió haber renunciado a la representación legal del Municipio de Yauco antes de gestionar la venta de su finca a éste, para así despejar incertidumbres sobre la licitud o propiedad de su actuación.

▆▆▆▆▆ Nótese también que el querellado debió haber tenido, cuando menos, alguna duda sobre cuál era el correcto proceder profesional en la situación en cuestión. Para el tiempo en que surgió dicha situación, estaba en vigor la Ley de Ética Gubernamental del Estado Libre Aso-

---

afectarse la relación de abogado-cliente entre ellos, y la deseabilidad de que el cliente obtuviese consejo legal independiente de otro abogado con respecto a dicha transacción. Véanse: *Matter of James*, 452 A.2d 163 (1982); Wolfram, *Modern Legal Ethics*, St. Paul, Ed. West Pub. Co., 1986, págs. 484–485; ABA/BNA *Lawyers' Manual on Professional Conduct* Sec. 51:504 (1988).

ciado de Puerto Rico, que aplica a los municipios. Véase 3 L.P.R.A. sec. 1802(e). El Art. 3.3 de dicha ley, 3 L.P.R.A. sec. 1823, disponía entonces que ningún municipio podía llevar a cabo un contrato en el que "cualquiera de sus funcionarios o empleados o algún miembro de las unidades familiares de éstos tenga ... directa o indirectamente, interés pecuniario, a menos que el Gobernador, previa recomendación del Secretario de Hacienda y del Secretario de Justicia, lo autorice". 3 L.P.R.A. sec. 1823(d). Aunque dicha ley no establece una prohibición absoluta y, además, es cuestionable si aplica a un asesor legal de un municipio que trabaje *a tarea parcial*, el principio general que la disposición aludida incorpora era de por sí suficiente para que un abogado consciente se cuestionara sobre la licitud o propiedad de la acción contemplada. *La disposición en cuestión trataba específica y concretamente con el asunto de los contratos entre un funcionario municipal y el municipio*, y bastaba para alertar al querellado no sólo de que debía actuar con cautela sino, además, de que debía cuestionarse cuál era el modo correcto de proceder, sobre todo en vista de nuestra reiterada exigencia de que todo abogado debe ser *escrupuloso* en el cumplimiento de las normas de ética profesional, y debe cuidarse de que sus actuaciones no den margen *a la más leve sospecha* de impropiedad. *In re Roldán González*, supra; *In re Rojas Lugo*, supra. Como hemos señalado antes, "las dudas sobre cuestiones de ética profesional debe resolverlas el abogado con rigurosidad contra sí mismo". *In re Valentín González*, supra, pág. 73; *In re Carreras Rovira y Suárez Zayas*, supra.

Finalmente, debe tenerse en cuenta que vivimos en una época aciaga, que se caracteriza por la creciente y justificada desconfianza de la gente en sus instituciones. Es de conocimiento general que prevalece en el país la sospecha y la suspicacia con respecto a los procesos colectivos. En estas circunstancias, los abogados deben ser particularmente cuidadosos en sus labores profesionales y en su relación

con la cosa pública, además de ser siempre conscientes de que la fe en la Justicia es uno de los factores determinantes sobre los cuales descansa la convivencia social.

Los tribunales tradicionalmente han reprobado que los abogados mantengan relaciones de negocio con sus clientes. *Matter of Lowther*, 611 S.W.2d 1 (1981); *Greene v. Greene*, 451 N.Y.S.2d 46 (1982); Wolfram, *Modern Legal Ethics*, St. Paul, Ed. West Pub. Co., 1986, pág. 479; ABA/BNA *Lawyers' Manual on Professional Conduct* Sec. 51:501 (1988); *Developments in Law: Conflicts of Interest in the Legal Profession*, 94 Harv. L. Rev. 1244, 1286 (1981). Ello es particularmente cierto cuando el cliente es una entidad gubernamental. Pocas cosas son tan destructivas de la integridad gubernamental y de la confianza pública en los abogados y en las instituciones de gobierno que la explotación real o aparente de la relación profesional con algún ente del Estado para fines personales. Íd., pág. 1423.

Por todo lo anterior, resolvemos que el querellado en este caso debió renunciar a su cargo de asesor legal del Municipio de Yauco antes de entrar en negocios con éste para la venta de su finca. Al no hacerlo, faltó a la ética profesional.([2]) Por los fundamentos, expuestos procede alguna sanción.

## V

En el caso ante nos, el querellado no obtuvo un beneficio injustificado de la venta de la finca en cuestión, ya que laspartes están de acuerdo con que ésta se vendió por lo

([2]) No consideramos aquí el otro fundamento que tuvo el Comisionado para concluir que el querellado actuó de forma impropia, relativo a la conducta de éste con respecto al pago de su deuda contributiva. No tenemos ante nos una situación de hechos idónea que nos permita evaluar adecuadamente esta difícil cuestión.

Para comenzar, la querella del Procurador General no especifica en los cargos formales imputación concreta alguna sobre el particular. En varios de sus escritos, el Procurador General alude a supuestas manipulaciones del querellado para defraudar al erario, pero no se presentó cargo específico alguno sobre el particular.

que valía en el mercado. No consta tampoco que la finca no era adecuada para los fines particulares por los cuales el Municipio de Yauco la adquirió. No surge de modo alguno que el querellado haya inducido al Alcalde o a la Asamblea Municipal a comprarle la finca, ni que les haya asesorado sobre el particular. Tampoco existe una situación en que el querellado se haya aprovechado de información privilegiada, ya que desde mucho antes que se consumara la venta en cuestión —cinco años antes— era de conocimiento público que la Legislatura había asignado fondos para la adquisición de alguna finca para la construcción del parque de pelota municipal.

En vista de lo anterior, y tomando en cuenta que no nos habíamos expresado antes sobre la cuestión concreta ante nos ahora, limitamos nuestra sanción en este caso a una censura formal, con el apercibimiento correspondiente.

Se le advierte a la profesión jurídica que, formulada

---

En segundo lugar, en el informe del Comisionado sólo se formulan determinaciones de hecho relativas: (1) al monto de la deuda contributiva del querellado, y (2) al hecho de que éste cumplió tardíamente con el compromiso de inscribir en el Registro de la Propiedad las hipotecas que garantizaban los pagarés que el querellado había dado al Departamento de Hacienda para afianzar el pago de su deuda. Tales determinaciones de por sí no evidencian fraude de parte del querellado ni actividad criminal alguna por parte suya. Nótese que en este caso no ha mediado convicción alguna por razón de un delito contributivo, ni siquiera ha habido una una denuncia o acusación por tal delito. Por lo tanto, no aplica aquí lo resuelto en *In re Rivera Cintrón*, 114 D.P.R. 481 (1983).

Finalmente, el expediente de este caso está huérfano de datos esenciales que nos permitan evaluar la conducta del querellado. No sabemos, por ejemplo, si el querellado tiene bienes suficientes para atender la deuda contributiva. Ello es necesario para decidir si la falta de pago se debe a una actitud contumaz del querellado o si, en cambio, responde a su situación económica. Tampoco tenemos un cuadro claro sobre los tratos del querellado con el Departamento de Hacienda ni sobre las acciones judiciales de éste contra el querellado. ¿Han habido transacciones entre ellos, además de las aludidas en esta opinión? ¿Hay pleitos pendientes? ¿Porqué el Estado no ha procedido penalmente contra el querellado, si es que no lo ha hecho? ¿Se ha intentado ejecutar alguna propiedad del querellado para cobrar la deuda contributiva?

Ante un cuadro de hechos tan incompleto, no es aconsejable encarar aquí la difícil cuestión de si en algún momento la falta de cumplimiento con las obligaciones fiscales de un abogado constituye una violación a la ética profesional. Véanse: *In re Fahey*, 505 P.2d 1369 (Cal. 1973); *Attorney Grievance Comm'n of Maryland v. Walman*, 374 A.2d 354 (1977); *Grievance Comm'n v. Pohlman*, 248 N.W.2d 833 (1976); *Columbia Bar Ass'n v. Wolfe*, 434 N.E.2d 1096 (1982); *Attorney Grievance Comm'n of Md. v. Deutsch*, 450 A.2d 1265 (1982).

aquí concretamente la norma aplicable a situaciones como la de autos, en adelante impondremos sanciones más severas por violaciones a la norma ética referida.

*Se dictará sentencia conforme a lo aquí expuesto.*

El Juez Asociado Señor Rebollo López disintió sin opinión escrita. El Juez Asociado Señor Negrón García se inhibió. La Juez Asociada Señora Naveira de Rodón no intervino. El Juez Asociado Señor Corrada Del Río no intervino.