per curiam:
El presente recurso disciplinario comenzó con la presentación de una queja presentada por el Sr. Luis A. Moyet contra los Ledos. Ciro A. Betancourt Meneses, Eduardo A. Betancourt Meneses y Manuel E. Romeu Fernández.(1) A continuación, la conducta que motivó el procedimiento disciplinario.
I
El señor Luis A. Moyet le entregó $415,000 al licenciado Ciro Betancourt Meneses para que éste los depositara en una cuenta de plica escrow account. Luego de la entrega, el licenciado Ciro Betancourt Meneses abrió una cuenta en la institución financiera Paine Webber y depositó en ésta una suma monetaria ascendente a $300,000, y se quedaron con los restantes $115,000 como depósito en el Bufete Betancourt. Con posterioridad, la cuenta de Paine Webber fue cambiada; primero, en la misma institución bancaria a nombre de dos corporaciones del querellante, y luego a cuentas abiertas en Charles Schwab, a nombre de las mis-mas corporaciones.
Antes del cambio de las cuentas a Charles Schwab, el Ledo. Ciro Betancourt Meneses retiró voluntariamente de la cuenta de Paine Webber $50,000. De igual forma, el Ledo. Ciro Betancourt Meneses, así como su hermano, el Ledo. Eduardo Betancourt Meneses, utilizaron los $115,000 dejados en depósito en su oficina; ambas cantidades fueron utilizadas para beneficio personal. Valga aclarar que el re-tiro y uso del dinero fue realizado sin el consentimiento del querellante, Sr. Luis A. Moyet.
*832 Retirado y utilizado el dinero, el 3 de noviembre de 1994 los licenciados Betancourt Meneses se comprometieron a devolverlo. Muestra del compromiso es la carta que le en-viaron al Sr. Luis A. Moyet en la que aceptaron su respon-sabilidad por el retiro y el uso de los $165,000. El Ledo. Ciro Betancourt Meneses y su esposa, Sra. Norah Dexter García, le envió un pagaré al señor Luis A. Moyet por la suma de $50,000 con un interés al diez por ciento vence-dero a su presentación y pagadero en seis meses. Por la importancia en la presente controversia, transcribimos la carta en cuestión. Veamos:
November 3rd, 1994
Mr. Luis Moyet
President
Luda Corporation, Inc.
Escorial 742
Puerto Nuevo, Puerto Rico 00920
Dear Mr. Moyet:
This will ascertain the Fact that this office has invested in various mortgages of a yearly term, the sum of $115,000 out of the money that you deposited in escrow with us for which we personally are responsible.
The balance of $300,000 was deposited in a Paine Webber account and is in the process of being transferred to an account under the name of the corporation.
As you know from the amount deposited in Paine Web[b]er Mr. Ciro Betancourt took the sum of $50,000 for which a Note is enclosed herein, which he expects to return within the next 60 days.
The mortgages will be deposited in the corporation account as they become due within the next six months.
Sincerely,
(Signed) Ciro A. Betancourt
(Signed) Eduardo A. Betancourt
Informe al Honorable Tribunal Supremo de la Comisionada Especial, pág. 9.
Ante el hecho de que los licenciados no pudieron satis-facer el dinero adeudado, el Ledo. Ciro Betancourt Me- *833 neses y su esposa, señora Dexter García, otorgaron una escritura pública sobre hipoteca a favor del señor Luis A. Moyet ante el notario Romeu Fernández por $195,000. Dicha escritura pública sobre hipoteca estaba supuesta a constituirse sobre la residencia del matrimonio. El quere-llante expresó que, a pesar de que la deuda era por $165,000, la hipoteca estaba supuesta a garantizar $195,000 debido a que en ésta se pactaron $30,000 en con-cepto de intereses.
El referido instrumento público menciona que la propie-dad solamente está gravada por una primera hipoteca a favor de HF Mortgage por $65,456, cuando en realidad te-nía dos gravámenes adicionales, uno por $25,000 y otro por $24,000. Por ello, la hipoteca estaba supuesta a quedar inscrita en rango de cuarta y no de segunda, como éste especificó en la misma. Por ser la hipoteca de naturaleza constitutiva por su inscripción en el Registro de la Propie-dad, el Ledo. Ciro Betancourt Meneses se comprometió a presentarla para su inscripción, de manera que ésta adqui-riera fuerza erga omnes, gestión que nunca realizó. El que-rellante, Sr. Luis A. Moyet, declaró que el Ledo. Ciro Be-tancourt Meneses le indicó que la había inscrito.
En otra transacción, el Ledo. Ciro Betancourt Meneses gestionó con el Sr. Luis A. Moyet un préstamo con garantía hipotecaria con el Banco Santander, en el cual el Sr. Luis A. Moyet se obligó solidariamente. Pasado el tiempo, el Banco Santander le notificó al Sr. Luis A. Moyet que el Ledo. Ciro Betancourt Meneses no estaba al día en los pa-gos, por lo que era necesario que éste procediera a realizar el pago correspondiente por ser esta una obligación solidaria. El Sr. Luis A. Moyet realizó múltiples gestiones tratando de cobrar las mensualidades vencidas —resul-tando éstas infructuosas— por lo que procedió a realizar los pagos y saldar la deuda para que no se viera afectado su crédito.
*834 El querellante, Sr. Luis A. Moyet, atestó haberle dado múltiples oportunidades al Ledo. Ciro Betancourt Meneses para que éste le respondiera, por lo que tuvo que pagar sin obtener resultado. Indicó que el licenciado Ciro Betancourt Meneses le contestaba que no tenía el dinero para pagar la deuda y que estaba dispuesto a obtener un seguro de vida para asegurar la suma monetaria que fue utilizada por él para beneficio propio.
En cuanto a este asunto, el Ledo. Ciro Betancourt Me-neses alegó que cuando se enteró de que el Sr. Luis A. Moyet había pagado el balance adeudado al Banco Santan-der le dio personalmente al querellante y en presencia de su abogado un cheque por $1,700.58 para reponer el pago que éste había hecho al Banco Santander. Dicho pago ale-gadamente no fue aceptado por el quejoso. Por ello, proce-dió a consignarlo en el Tribunal de Primera Instancia. El querellante afirmó que el Ledo. Ciro Betancourt Meneses se negó a pagar la deuda de $195,000 y la suma de $4,000 en concepto de honorarios de abogado, cantidades venci-das, líquidas y exigióles.
Ante este cuadro fáctico, el Sr. Luis A. Moyet presentó una demanda en cobro de dinero ante el Tribunal de Pri-mera Instancia. Indicó que incluyó al Ledo. Eduardo Be-tancourt Meneses por éste haber suscrito y firmado la carta donde atestaban haber utilizado el dinero y que se proponían restituirlo. Por otro lado, incluyó en el pleito al notario público Romeu Fernández por haber autorizado la escritura pública sobre hipoteca, supuesta a quedar en rango de segunda para garantizar los $195,000.
El 7 de noviembre de 1997 ordenamos la paralización del procedimiento disciplinario pendiente ante nos hasta tanto el Tribunal de Primera Instancia resolviera la con-troversia ante su consideración. De igual forma, ordena-mos a los abogados querellados mantenernos informados sobre los procedimientos judiciales relacionados con la de-manda sobre cobro de dinero.
*835 El Ledo. Ciro Betancourt Meneses aseguró que en nin-gún momento negó la deuda que tenía con el querellante ni se había negado a pagarla, pero que debido a su precaria situación económica tenía que acogerse a un procedimiento de quiebra. Igualmente, atestó que su hermano, el Ledo. Eduardo Betancourt Meneses, no tenía responsabilidad al-guna hacia el quejoso, ya que siempre estuvo al margen de los acuerdos entre éste y el Sr. Luis A. Moyet. En cuanto al Ledo. Eduardo Betancourt Meneses, éste alegó que nunca firmó la carta aceptando la deuda y que existe gran dife-rencia entre su firma y la que aparece en la carta.
El notario público Romeu Fernández sostuvo estar ajeno a cualquier relación profesional o personal entre el Sr. Luis A. Moyet y el Ledo. Ciro Betancourt Meneses. Ex-puso, además, que el Ledo. Ciro Betancourt Meneses tuvo la necesidad de utilizarlo como notario público en el otor-gamiento de la escritura por su relación de amistad y que, tratándose de un asunto personal, aceptó autorizarla.
El notario público Romeu Fernández declaró que el Ledo. Ciro Betancourt Meneses preparó la escritura sobre hipoteca y que luego de éste revisarla y asegurarse, a su entender, de que estaba correcta, prosiguió con el otorgamiento. Aceptó que confió en la información provista por el Ledo. Ciro Betancourt Meneses, la cual expresaba que la propiedad en cuestión le pertenecía a éste y a su esposa, la señora Dexter García, y que el inmueble sólo estaba gravado por una primera hipoteca a favor de First Finance Caribbean Corp. h/n/c H.F. Mortgage Bankers.
De igual forma, aceptó que cometió el error de no veri-ficar el estado registral de la propiedad. Aseveró, a su vez, que éste hizo constar en la escritura que la hipoteca se constituiría para su inscripción en el rango que resultara del Registro de la Propiedad.(2) Explicó que entregó al *836 Ledo. Ciro Betancourt Meneses una copia certificada de la escritura sobre hipoteca en controversia y expresó que el propósito del Sr. Luis A. Moyet para incluirlo en la queja fue ejercer presión ya que, a su entender, ésta no tenía justificación alguna, al menos en su contra ni contra el Ledo. Eduardo A. Betancourt Meneses.
De acuerdo con una petición de quiebra según el Capí-tulo Trece de la Ley de Quiebras,(3) el 6 de octubre de 1997 el Tribunal Federal de Quiebras ordenó la paralización de los procedimientos en el Tribunal de Primera Instancia contra el Ledo. Ciro Betancourt Meneses y su esposa, se-ñora Dexter García. El 14 de octubre de 1997, el foro pri-mario dictó una sentencia parcial que paralizó los procedi-mientos contra el Ledo. Ciro Betancourt Meneses y su esposa hasta que finalizaran los trámites en el Tribunal Federal de Quiebras. El 28 de septiembre de 1999, el refe-rido foro federal desestimó la petición solicitada por el Ledo. Ciro Betancourt Meneses y su esposa, señora Dexter García.
El 7 de marzo de 2002, el Tribunal de Primera Instancia dictó una sentencia sumaria parcial en la que condenó a los codemandados, Ledo. Ciro Betancourt Meneses, la señora Dexter García, la Sociedad Legal de Gananciales com-puesta por ambos y al Ledo. Eduardo Betancourt Meneses, a pagar solidariamente al demandante y aquí querellante una indemnización por la cantidad de $115,000. Dispuso, a su vez, que el Ledo. Ciro Betancourt Meneses, su esposa y la Sociedad Legal de Gananciales responderían por una suma adicional ascendiente a $50,000 por la cantidad uti-lizada para su beneficio.
El foro primario declaró “no ha lugar” una solicitud de sentencia sumaria presentada por el licenciado Romeu y Fernández, y dispuso una vista en su fondo para fijar la responsabilidad civil de éste como notario público. El Tri *837 bunal de Primera Instancia concluyó que el notario público Romeu Fernández no tenía la obligación de realizar un es-tudio de título conforme a la norma establecida por este Tribunal en el caso Chévere v. Cátala, 115 D.P.R. 432, 443-445 (1984). El foro primario indicó que pudo haber cum-plido con la norma mediante las debidas advertencias a los otorgantes de la conveniencia de hacer un estudio de título y consignar dicha advertencia en la escritura, cosa que nunca ocurrió. Concluyó que el notario público Romeu Fer-nández reconoció el error de no haber verificado el estado registral de la propiedad. Sin embargo, el caso fue archi-vado por inactividad el 21 de febrero de 2003.

No obstante, el 1 de mayo de 2003 emitimos una Resolu-ción en la que le ordenamos al alguacil de este Tribunal que se incautara de la obra y del sello notarial del señor Romeu Fernández por haber desatendido varios requerimientos nuestros, y lo suspendimos inmediata e indefinidamente de la abogacía y notaría mediante opinión “per curiam” de 30 de abril de 2003. 
(4)

El señor Romeu Fernández solicitó —mediante una mo-ción— la reconsideración de la decisión de este Tribunal en cuanto a su suspensión indefinida por haber desatendido nuestras Resoluciones de 16 de octubre y 30 de diciembre de 2002. El 12 de marzo de 2004, le concedimos un término al Procurador General para que se expresara sobre dicha solicitud de reinstalación. En cumplimiento con la orden, el Procurador General expresó no tener objeción a su reinstalación. El 14 de junio de 2004 ordenamos la reins-talación de Romeu Fernández al ejercicio de la abogacía, mas no así a la notaría, debido a que su obra notarial ha-bía sido incautada y se encontraba bajo la investigación de la Oficina del Director de Inspección de Notarías. En la inspección se encontraron múltiples deficiencias, las cuales no han sido corregidas por el licenciado Romeu Fernán- *838 dez; por todo lo cual, continúa suspendido indefinidamente de la notaría.
Imprescindible resulta mencionar que el 14 de diciem-bre de 2005 se celebró una conferencia inicial en la cual estuvo presente el Ledo. Ciro Betancourt Meneses, y en la cual la Procuradora General Auxiliar informó que no cons-taba en el expediente una contestación de la querella por parte de tal abogado, lo que propició el que se le diera un tiempo adicional para replicar. Celebrada una segunda conferencia sobre el estado de los procedimientos el 7 de marzo de 2006, el Ledo. Ciro Betancourt Meneses no compareció. Su hermano, el Ledo. Eduardo Betancourt Me-neses, presentó ante la Procuradora General Auxiliar un informe médico suscrito por el doctor Sánchez Borrero el 13 de enero de 2006 donde se indica que el Ledo. Ciro Betan-court Meneses padece de una condición mental que lo inca-pacita para ejercer la profesión de la abogacía. Así las co-sas, se trajo esta situación ante nos y se solicitó que aplicáramos la Regla 15(a) y (c) de nuestro Reglamento.(5)
Ante esta situación, el 10 de noviembre de 2006 emiti-mos una Resolución en la cual ordenamos la páralización de los procedimientos disciplinarios en cuanto al Ledo. Ciro Betancourt Meneses y ordenamos que se continuara el pro-cedimiento contra los demás querellados, Ledos. Eduardo Betancourt Meneses y Romeu Fernández. No obstante, a pesar de la paralización, este Tribunal nunca se expresó en cuanto a la activación de la Regla 15 de nuestro Regla-mento, supra. Por ello, la querella presentada contra el Ledo. Ciro Betancourt Meneses quedó sometida para nues-tra adjudicación.
A pesar de lo anterior, el Ledo. Ciro Betancourt Meneses fue suspendido indefinidamente de la abogacía y notarí a por incumplir reiteradamente con el deber notarial de es-tampar los sellos de rentas internas, así como los sellos de impuesto notarial y adeudar una cantidad global de *839 $24,441.(6) Lo anterior demuestra claramente que a pesar de someter una certificación médica que declare que el Ledo. Ciro Betancourt Meneses está incapacitado para ejer-cer la profesión de la abogacía, y que por tal motivo alega-damente desatendió nuestras órdenes y dilató el procedi-miento disciplinario en su contra, el Ledo. Ciro Betancourt Meneses continuó ejerciendo la profesión de la abogacía y la notaría.
Expuestos los hechos, analicemos los cánones del Có-digo de Etica Profesional,(7) así como las disposiciones de la Ley Notarial de Puerto Rico (Ley Notarial)(8) aplicables a la presente controversia.
II
El Canon 18 del Código de Ética Profesional dispone que “[e]s deber del abogado defender los intereses del cliente diligentemente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica en general estima adecuada y responsable”.(9) El Canon 19 dispone, a su vez, que “[e]l abogado debe mantener a su cliente siempre informado de todo asunto importante en el desarrollo del caso que le ha sido encomendado”.(10)
Por otra parte, el Canon 21 del Código de Ética Profesional exige que todo “abogado tiene para con su cliente un deber de lealtad completa. ... Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales”.(11) Dicha norma pretende evitar diversas ma- *840 nifestacion.es de conducta antiética: una de ellas ocurre cuando su juicio profesional se ve afectado por intereses personales, esto debido a que la lealtad hacia el cliente debe ser completad.(12) En In re Toro Cubergé, 140 D.P.R. 523 (1993) mencionamos varias instancias en las cuales consideramos impropio que los abogados se involucren en asuntos contrarios a la mejor defensa de su cliente. Todas esas instancias tienen un elemento común:
“[L]a imposibilidad legal de simultanear dos o más cargos, funciones o misiones en una misma persona. ... La premisa es sencilla: quien no sea independiente no está en condiciones de ejercer la profesión. ... De este modo se busca preservar la autonomía del abogado y prevenir cualquier tipo de dilución a la fidelidad que debe a su cliente.”(13)
Expresamos en In re Morell, Alcover, 158 D.P.R. 791, 807 (2003), que la norma establecida en In re Toro Cubergé, supra, “va dirigida a prohibir, de ordinario, las transacciones comerciales entre un abogado y su cliente, cuando éstas tienen el potencial de afectar el juicio profesional independiente del abogado o cuando éstas puedan afectar el deber de lealtad y fidelidad que se le debe al cliente”. A esos efectos, en In re Morell, Alcover, supra, págs. 805-806, dispusimos que
[l]as transacciones comerciales entre un abogado y su cliente o aquellas instancias en que un abogado, a sabiendas, adquiere un interés pecuniario, propietario o posesorio en un bien de su cliente, han motivado nutridas discusiones por los potenciales conflictos que acarrea. Estas han sido reconocidas como situaciones que podrían crear en el abogado un conflicto entre los intereses del cliente y los propios, pudiendo afectar su juicio profesional. A tales efectos, se ha resaltado que las transacciones comerciales con un cliente son inherentemente sospechosas. Esto pues, no sólo el juicio profesional independiente del abogado puede ser seriamente afectado por sus intereses personales en la transacción, sino que la naturaleza desigual de la relación abogado-cliente (en la que el abogado *841 adquiere un sinnúmero de información í ntima del cliente y éste, a su vez, deposita su confianza y lealtad en el abogado), la hace susceptible de múltiples abusos.
Es precisamente la naturaleza de esta relación (mediante la cual un abogado adquiere numerosa información confidencial de su cliente, ganándose su confianza y lealtad)!,] la que la hace objeto de potenciales abusos. Cada vez que un abogado realiza una transacción con su cliente, se plantea la posibili-dad de que el letrado utilice sus destrezas legales y su posición para aprovecharse del cliente, utilizando, por ejemplo, su in-fluencia o la información confidencial obtenida para su bene-ficio personal. Por tales razones, los tribunales han sido suma-mente rigurosos al analizar estas transacciones.
De igual manera, el Canon 23 del Código de Ética Profesional exige que
[e]l abogado no debe adquirir interés o participación alguna en el asunto en litigio que le haya sido encomendado.

La naturaleza fiduciaria de las relaciones entre abogado y cliente exige que é stas estén fundadas en la honradez absoluta. En particular, debe darse pronta cuenta del dinero u otros bie-nes del cliente que vengan a su posesión y no debe mezclarlos con sus propios bienes ni permitir que se mezclen.

(14)

En cuanto al Canon 35, éste pretende salvaguardar lo siguiente: “[l]a conducta de cualquier miembro de la profesión legal ante los tribunales, para con sus representados y en las relaciones con sus compañeros debe ser sincera y honrada”.(15)
Aplicable también es el Canon 38, el cual dispone, en esencia, lo siguiente:
El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque él así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. ...
*842 Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida pri-vada como en el desempeño de su profesión, debe conducirse en forma digna y honorable.(16)
Hemos señalado que esta norma “exige que los abogados se esfuercen al máximo en exaltar el honor y la dignidad de la profesión legal, obligación que se extiende a su vida personal y privada”.(17) Impone la obligación de evitar hasta la apariencia de conducta profesional impropia. (18)
En cuanto a los notarios públicos, éstos representan la fe pública, son responsables y tienen la obligación de conocer el estado registral de la propiedad sobre la cual otorgan una escritura pública.(19) Al ser el notario público el principal custodio de la fe pública, éste tiene el deber de hacer las aclaraciones y advertencias pertinentes a los otorgantes para lograr un consentimiento informado de su parte.(20) El notario público está obligado a advertir a los otorgantes la necesidad de inscribir todo documento que así lo requiera, no importa su grado de educación. Lo anterior es función inherente del notario público, máxime cuando se trata de un negocio jurídico de naturaleza voluntaria y la parte que se puede ver afectada por la falta de inscripción del documento público es un tercero que no comparece a su otorgamiento.
El Artículo 2 de la Ley Notarial(21) dispone que todo notario público tiene la obligación de dar fe y autenticidad conforme a las leyes que regulan los diversos negocios jurídicos y demás actos, así como hechos extraju- *843 diciales que se realicen ante él. En cuanto a este asunto, hemos resuelto que
[e]s indeclinable sn obligación de conocer el estado registral de la propiedad en su fruición principal de custodio de la fe pú-blica, base esencial del sistema del notariado. ... Es incuestio-nable la importancia que reviste investigar los antecedentes, las cargas y los gravámenes, al hacerse o autorizarse una es-critura, no sólo para efectos civiles o regístrales, sino también para efectos notariales, “ ‘porque la determinación de las car-gas es necesaria para la posterior concreción de la parte dis-positiva de las responsabilidades que contrae cada parte con-tratante ...’ ”. Incurrir en esta falta, convierte al notario en “ ‘coautor de un consentimiento enfermo e ineficaz en derecho y habrá traicionado la fe de la que es principal guardador’ ”. (Citas omitidas.(22)
Por todo lo cual, para evitar que un notario público asevere consciente o inconscientemente un hecho falso, éste tiene el ineludible deber de hacer las averiguaciones necesarias que requieren las más elementales normas de la profesión notarial. (23) Cuando un notario público autoriza una escritura pública y hace constar que la propiedad está libre de cargas y gravámenes, y resulta que este hecho es contrario a la realidad registral, se viola la fe pública notarial. “[E]l notario que autoriza una escritura [pública] no puede ignorar el estado registral de la propiedad sobre la cual las partes otorgan la escritura a la fecha del otorgamiento.”(24) Lo que es más, dar fe de algo que no le consta equivale a faltar a la verdad. Es necesario mencionar que cuando un notario público incluye en un instrumento público información falsa, aunque no sea intencionalmente, viola el Canon 35 del Código de Etica Profesional, supra, ya que falta a la honradez y ala sinceridad.(25)
*844 III
Aunque este Tribunal conoce sobre la suspensión indefi-nida del Sr Ciro Betancourt Meneses, así como de la sus-pensión indefinida de la notaría del licenciado Romeu Fer-nández, las alegaciones sobre violaciones éticas aquí presentes podrán ser consideradas en cualquier solicitud de reinstalación que éstos puedan presentar en el futuro. En cuanto al Ledo. Eduardo Betancourt Meneses, el Informe de la Comisionada Especial (Informe de la Comisionada) nos señala que la conducta desplegada por éste viola los Cánones 18, 19, 21, 23, 35 y 38 del Código de Ética Profe-sional, supra.
El Informe de la Comisionada concluye que el Ledo. Eduardo Betancourt Meneses violó su deber de diligencia, lealtad y honradez hacia el Sr. Luis A. Moyet al no cumplir con su deber como depositario de las cantidades moneta-rias que éste confió en el Bufete Betancourt. También, in-dica que el Ledo. Eduardo Betancourt Meneses utilizó el dinero para uso personal —sin el consentimiento del Sr. Luis A Moyet— le imprimió un uso distinto a los fondos confiados al Bufete Betancourt y no cumplió con lo acor-dado y deseado por el Sr. Luis A. Moyet.(26)
El Informe de la Comisionada nos señala que el Ledo. Eduardo Betancourt Meneses violó el Canon 21, supra, al involucrarse en los negocios del Sr. Luis A. Moyet, utili-zar su dinero en forma contraria a lo acordado y al obtener un beneficio personal. Arguye, además, que incurrió en violaciones a los Cánones 25 y 35 del Código de Ética Profesional, supra, al envolverse en un conflicto de interés por involucrar los fondos del cliente en un negocio relacio-nado con la propiedad en la que ubican sus oficinas de abogado, las cuales compartía con su socio y hermano, el Sr. Ciro Betancourt Meneses. En síntesis, aunque fue el *845 Sr. Ciro Betancourt Meneses el que invitó al Sr. Luis A. Moyet a convertirse en deudor solidario de un préstamo, lo cierto es que el negocio involucraba la propiedad donde es-tán ubicadas las oficinas del Bufete Betancourt, del cual el Ledo. Eduardo Betancourt Meneses también es dueño.(27) Tal proceder no responde al deber de fiducia que debe per-mear en toda relación abogado-cliente.
A pesar de los señalamientos contenidos en el Informe de la Comisionada, ésta nos sugiere que consideremos los atenuantes siguientes en el caso del Ledo. Eduardo Betan-court Meneses y así lo hacemos:

1) El Ledo. Eduardo Betancourt fue admitido a la profesión legal el 6 de noviembre de 1979 y ala notarí a el 20 de octubre de 1980 y nunca antes había tenido que enfrentar un proceso disciplinario, por lo cual ha sufrido mucho, según ha expresado.

2) Su incumplimiento con los Cánones de Etica no proviene de actuaciones intencionales de él, ni de un patrón de conducta establecido. Por el contrario, es un hombre mayor que lo perci-bimos como una persona seria y respetuosa en todos los órde-nes de la vida, aunque excesivamente confiado, lo que lo llevó al descuido.

3) Ha mostrado arrepentimiento y dolor por todo lo que este proceso ha traído a su vida y su situación económica es muy difícil debido a ello.

4) No se aportó evidencia alguna que demostrase que el quere-llado se lucró personalmente. Por el contrario, se afectó económicamente.

5) Su papel fue pasivo en toda la controversia que dio origen a la queja que desencadenó en el procedimiento disciplinario que nos ocupa. De hecho, el quejoso afirmó en su queja que sólo lo incluyó por haber suscrito la carta del 3 de noviembre de 1994 con su hermano Ciro Betancourt. (Enfasis suplido.(28)
Los hechos planteados en la presente acción disciplina-ria forzosamente nos llevan a coincidir con la Comisionada en que la conducta del Ledo. Eduardo Betancourt Meneses en nada exalta la dignidad de la profesión de la *846 abogacía. Ahora bien, consideramos que dicha conducta, bajo sus circunstancias particulares, no lo hace indigno de ejercer la profesión de la abogacía. La conducta del Ledo. Eduardo Betancourt Meneses se debe, más bien, a la con-fianza depositada en su hermano y compañero del Bufete Betancourt, el Sr. Ciro Betancourt Menenses.
Considerando que el presente recurso disciplinario está íntimamente relacionado con el pleito en cobro de dinero que llevó el Sr. Luis A. Moyet contra el Ledo. Eduardo Be-tancourt Meneses y otros —cuya sentencia le ordenó al Ledo. Eduardo Betancourt Meneses que indemnizara soli-dariamente al Sr. Luis A. Moyet por $115,000 — (29) además de que el Ledo. Eduardo Betancourt Meneses ha gozado de una excelente reputación por más de veintinueve años; que esta es la primera querella que se presenta en su contra y que nos demuestra estar sumamente arrepentido por las consecuencias causadas por su conducta, no debemos de imponerle una doble penalidad.

Por todo lo expuesto, y considerando los atenuantes con-tenidos en el Informe de la Comisionada, amonestamos al Ledo. Eduardo Betancourt Meneses y le apercibimos que de observarse una conducta similar en el futuro, podríamos suspenderlo del ejercicio de la abogacía.

La Jueza Asociada Señora Fiol Matta disintió con una opinión escrita, a la que se unieron el Juez Presidente Se-ñor Hernandez Denton y la Juez Asociada Señora Rodrí-guez Rodríguez.

 El Ledo. Ciro A. Betancourt Meneses fue admitido a la profesión de la abo-gacía el 27 de mayo de 1971 y a la notaría el 9 de junio de 1971. El Ledo. Eduardo A. Betancourt Meneses fue admitido a la profesión de la abogacía el 6 de noviembre de 1979 y a la notaría el 20 de octubre de 1980. El licenciado Romeu Fernández fue admitido a la profesión de la abogacía el 29 de mayo de 1980 y a la notaría el 3 de julio de 1980.

 Véase Escritura, pág. 5.

 11 U.S.C.A. secs. 1301-1330.

 In re Romeu Fernández, 159 D.P.R. 399 (2003).

 In re Aprobación Reglas, 164 D.P.R. 137, 150-151 (2005).

 In re Betancourt, 173 D.P.R. 716 (2008).

 4 L.P.R.A. Ap. IX.

 4 L.P.R.A. secs. 2001-2141.

 4 L.P.R.A. Ap. IX.

 4 L.P.R.A. Ap. IX.

 4 L.P.R.A. Ap. IX.

 In re Toro Cubergé, 140 D.P.R. 523 (1996).

 Íd., pág. 531.

 4 L.P.R.A. Ap. IX.

 4 L.P.R.A. Ap. IX.

 4 L.P.R.A. Ap. IX.

 In re Aviles, Tasado, 157 D.P.R. 867, 892 (2002).

 Íd.

 Chévere v. Cátala, supra; In re López Maldonado, 130 D.P.R. 863 (1992); In re Ramos Meléndez y Cabiya Ortiz, 120 D.P.R. 796 (1988).

 In re Meléndez Pérez, 104 D.P.R. 770 (1976); In re Vargas Hernández, 135 D.P.R. 603 (1994).

 4 L.P.R.A. sec. 2002.

 In re Pizarro Colón, 151 D.P.R. 94, 106 (2000).

 In re Vera Vélez, 148 D.P.R. 1 (1999).

 Íd., pág. 9.

 In re Montañez Miranda, 157 D.P.R. 275 (2002).

 Véase Informe de la Comisionada Especial, págs. 13-19.

 id.

 Véase Informe de la Comisionada Especial, págs. 37-38.

 Véase Informe de la Comisionada Especial, pág. 11.